## S01A0930. TAYLOR v. THE STATE.
(553 SE2d 598)

FLETCHER, Chief Justice.

In accordance with the Unified Appeal Procedure, we granted Robin Leigh Taylor's application for interim review before her death penalty case proceeds to trial. We requested that the parties address the following matters: (1) whether Taylor's references to a lawyer during her interview on October 6, 1999, constituted a request for counsel; (2) whether comments that police officers made to Taylor constituted a hope of benefit under OCGA § 24-3-50; and (3) whether the alleged murder weapon would have been inevitably discovered without Taylor's statement.

Because Taylor's videotaped statement shows that she made an unambiguous request for counsel during her interview, we conclude that her statement must be suppressed. We reject, however, her contention that the officers induced her to confess by holding out a hope of benefit and affirm the trial court's ruling that her statement was voluntary under OCGA § 24-3-50. Although we find that the evidence is too speculative to conclude that the police would have inevitably discovered the murder weapon without Taylor's statement, we nevertheless hold that the gun is admissible because the "fruit" of a *Miranda*[1] violation is not subject to the exclusionary rule under Georgia law.

### TAYLOR'S STATEMENT TO POLICE

Taylor is charged with malice murder, felony murder, armed robbery, and possession of a firearm during the commission of a felony. The State is seeking the death penalty. On the morning of December 28, 1998, Jay Basha was found dead in a Pizza Hut restaurant. Basha, the store manager, had arrived alone that morning to prepare the store for business. He was shot once in the back with a .38 handgun and approximately $500 was missing from the restaurant. Police found a cup on a shelf near the restaurant's back door that yielded a fingerprint that did not match the victim. The cup also contained ice, indicating that the fingerprint had been left around the time Basha was killed.

The police investigation focused on employees and former employees of the store who could have gained access to the restaurant before it opened for business. Taylor had been recently fired from the Pizza Hut. Upon initial analysis, the fingerprint taken from the cup did not match any fingerprints of the restaurant's employees or former employees. Months later, the GBI Crime Lab discovered

---

[1] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

that the fingerprint had been accidentally transposed. When properly examined, the fingerprint allegedly matched Taylor's fingerprint. The police obtained a warrant and arrested Taylor at her apartment on October 6, 1999. They read her *Miranda* rights from a card and Taylor affirmed that she understood those rights. Taylor was taken to police headquarters where Captain Simmons interviewed her. The interview was videotaped in its entirety.

At the beginning of the interview, Taylor acknowledged that a police officer had read her rights to her. Captain Simmons informed her that her fingerprint had been found at the crime scene and that she was being charged with murder and armed robbery. The following exchange then took place:

> Simmons: We can prove you were there, and I want to know exactly what happened. I want to know your side of it before we pick anybody else up, okay?
>
> Taylor: Okay.
>
> Simmons: Tell me about it.
>
> Taylor: Can I have a lawyer present when I do that?
>
> Simmons: You can.
>
> Taylor: Okay.
>
> Simmons: But I mean if you want a lawyer or – it ain't going to change, it's being recorded so whatever you say is not going to change it any form. But I mean if you decide you want a lawyer, we'll get you a lawyer, you know. But I can assure you you were there, but I'm wanting to know if you're want to tell your side of the story right now before it gets – before anybody else has the opportunity to say anything.

Taylor then admitted that she had been at the Pizza Hut on December 28 to return her uniform, but claimed that she did not kill Basha. Captain Simmons stated that evidence taken from the crime scene contradicted her story and urged her to tell the truth. The following exchange then took place:

> Simmons: We got videotapes of where that cup was sitting back there on that rack right there at the back door and your hand print all over it. Now I'm not lying to you, God is my witness, that's exactly where it's at. Now you need to tell it just like it is. You need to help yourself right now.
>
> Taylor: How can I do that without a lawyer?
>
> Simmons: Well, if you want a lawyer we'll get you a lawyer, but you can help yourself by telling the truth the way it goes.

I mean look, let me ask you a question, let me ask you a question, if you was to sit there and go before a judge and you said judge, yes I did it or I was there, or anything of this nature while it was being done, and I'm throwing myself at the mercy of the court, is that going to look good or is it going to look bad, or is it going to say look, do I do this, do I say I ain't done nothing, you know. I wasn't even there. I was at the front desk while we can prove you was at the back door. We can prove you was there when Jay got killed. Now that's the way I'm talking about do you want to help yourself. You're going to jail. You're going to jail one way or the other is what I'm trying to tell you, but what you want to do is up to you, how you want to help yourself during this whole ordeal.

Taylor: I want to help myself.

After further questioning, Taylor admitted that she was inside the Pizza Hut when Basha was killed. Initially, she stated that she let the killer in through the back door but eventually she admitted that she acted alone. She told Captain Simmons that she had stolen a .38 revolver from her mother and Basha let her inside the restaurant to return her uniform and get something to drink. While inside the store, Taylor shot the victim in the back, took $500, and left the cup by the back door. She told the police that the gun was at her mother's trailer. She then stated, "I want a lawyer," but police questioning continued. After the statement, the police obtained the alleged murder weapon from Taylor's mother at her trailer.

After a suppression hearing, the trial court ruled that the portion of the statement made after "I want a lawyer" was inadmissible. However, the trial court found that Taylor's statement before that point was admissible because her initial reference to an attorney was ambiguous and did not constitute a request for counsel. The trial court also found that Taylor's statement was voluntary and concluded that the gun would have been inevitably discovered regardless of the admissibility of Taylor's statement.

## TAYLOR'S REQUEST FOR COUNSEL

1. Taylor contends that her statement, "Can I have a lawyer present when I do that?" followed by "Okay" when told she could, was an unambiguous request for counsel that required the cessation of all questioning and that her entire ensuing statement is therefore inadmissible. We agree.

A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law

enforcement until an attorney has been made available or until the suspect reinitiates the conversation.[2] If the police persist in questioning a suspect who has requested that counsel be present, any resulting statements made by the suspect are inadmissible in the State's case-in-chief.[3] In *Davis v. United States*,[4] the United States Supreme Court stated that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[5] The Supreme Court found that the suspect's statement, "Maybe I should talk to a lawyer," was ambiguous and therefore not a clear request for counsel that required the cessation of questioning.[6] This Court reached the same result in *Jordan v. State*,[7] where the suspect said he "might need a lawyer" and the police continued to interrogate him. This Court held that this reference to a lawyer was ambiguous and that the suspect's ensuing statement was therefore admissible.[8]

Since the statement in Taylor's case was videotaped and there are no relevant additional facts, the trial court's application of the law to the undisputed facts is subject to de novo appellate review.[9] We conclude, based on our review of the videotaped statement, that Taylor unambiguously requested a lawyer to assist her when answering Captain Simmons's questions about what happened in the Pizza Hut. Unlike the suspects in *Davis* and *Jordan*, Taylor did not use equivocal words such as "might" or "maybe" when referring to her desire for a lawyer. She was also not referring to a need for counsel sometime in the future, and she did not volunteer information at any time during her statement.[10] Her desire for counsel was not ambiguous simply because it was articulated in the form of a question; it is common for people to ask for things by saying "Can I have . . . ?" Under the circumstances, a reasonable police officer would have understood that Taylor asked if she could have a lawyer because she wanted one.[11]

---

[2] *Edwards v. Arizona*, 451 U. S. 477, 484-485 (101 SC 1880, 68 LE2d 378) (1981).

[3] See id. at 487; *Oregon v. Hass*, 420 U. S. 714, 722-724 (95 SC 1215, 43 LE2d 570) (1975) (voluntary statement obtained after defendant requested a lawyer is inadmissible in State's case-in-chief, but may be admissible to impeach the defendant's testimony).

[4] 512 U. S. 452 (114 SC 2350, 129 LE2d 362) (1994).

[5] Id. at 459.

[6] See id. at 462.

[7] 267 Ga. 442 (1) (480 SE2d 18) (1997).

[8] See id. at 444.

[9] See *Lee v. State*, 270 Ga. 798 (7) (514 SE2d 1) (1999), quoting *Vansant v. State*, 264 Ga. 319 (2) (443 SE2d 474) (1994).

[10] See *Moore v. State*, 272 Ga. 359 (2) (528 SE2d 793) (2000); *Luallen v. State*, 266 Ga. 174 (4) (465 SE2d 672) (1996).

[11] See *Carter v. State*, 269 Ga. 891 (2) (506 SE2d 124) (1998) (after advising suspect of his right to have an attorney present, police officer ceased interrogation when suspect asked "Can I have one?").

Her later response to Captain Simmons's request for her to "tell it just like it is" — "How can I do that without a lawyer?" — further illustrates Taylor's belief that she needed a lawyer to assist during the police interrogation. In addition, we are troubled by Captain Simmons's response to Taylor's initial reference to a lawyer, which appeared to be an attempt to steer Taylor away from asking for the assistance of a lawyer. Taylor's request for counsel at the beginning of her interview was unambiguous and the police failure to cease the interrogation compels the suppression of her entire October 6, 1999, statement.[12]

## THE VOLUNTARINESS OF TAYLOR'S STATEMENT

2. Despite our decision that Taylor's statement must be suppressed, we must still determine whether Taylor's statement was voluntary because that issue may affect our decision on the admissibility of the gun. Taylor argues that Captain Simmons held out a hope of benefit to induce her to confess by saying that he would help her "in every way [he could]," telling her it might look good to a judge if she admitted her role in the crimes rather than lie, and also telling her that she had a "golden opportunity" to help herself.

A violation of a suspect's rights under *Edwards v. Arizona* does not mean that the suspect's ensuing statement was involuntary.[13] Under Georgia law, "[t]o make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."[14] Generally, the reward of a lighter sentence for confessing is the "hope of benefit" to which the statute refers.[15]

Based on our review of the record, we conclude that Taylor's statement was not elicited by a "hope of benefit." It is not improper for the police to encourage a suspect to help herself by telling the truth.[16] It also does not render a statement involuntary for the police to tell a suspect that the trial judge may consider her truthful cooperation with the police.[17] Captain Simmons's comment that he would try to help Taylor in every way he could came in the context of Taylor's concerns over the custody of her children and did not refer to

---

[12] See *Edwards*, 451 U. S. at 484-485.

[13] See id. at 483-484; *Hass*, 420 U. S. at 722-723; *Ward v. State*, 262 Ga. 293 (8) (417 SE2d 130) (1992).

[14] OCGA § 24-3-50; see also *Jackson v. Denno*, 378 U. S. 368, 376 (II) (84 SC 1774, 12 LE2d 908) (1964); *State v. Ritter*, 268 Ga. 108 (1) (485 SE2d 492) (1997).

[15] See *Ritter*, 268 Ga. at 109.

[16] See *Lee*, 270 Ga. at 800; *Gilliam v. State*, 268 Ga. 690 (3) (492 SE2d 185) (1997).

[17] See *Carswell v. State*, 268 Ga. 531 (2) (491 SE2d 343) (1997); *Arline v. State*, 264 Ga. 843 (2) (452 SE2d 115) (1995); *Leigh v. State*, 223 Ga. App. 726 (1) (478 SE2d 905) (1996).

any possible sentence she might receive. The videotape also reveals that Taylor was not threatened or coerced and that the interview lasted only one hour. Taylor asked for medication during the interview and said she was manic-depressive, but she appeared to be lucid and sober and Captain Simmons sent an officer to retrieve her medicine. The trial court did not err by ruling that the State had proven by a preponderance of the evidence that Taylor's statement was voluntary.[18]

## THE ADMISSIBILITY OF THE GUN

3. Taylor argues that, if her statement is held inadmissible, the gun should also be inadmissible as the "fruit of the poisonous tree."[19] The trial court found that the gun was admissible regardless of the admissibility of the statement because it would have been inevitably discovered by the police.

Under the inevitable discovery doctrine, if the State can prove by a preponderance of the evidence that evidence derived from police error or illegality would have been ultimately or inevitably discovered by lawful means, then the evidence is not suppressed as fruit of the poisonous tree.[20] In *Nix v. Williams*, the police obtained the defendant's statement about the location of the victim's body in violation of the defendant's constitutional rights and the statement was suppressed.[21] The United States Supreme Court concluded, however, that the victim's body discovered as a result of that statement need not be suppressed as fruit of the poisonous tree because it would have been discovered anyway.[22] A search party was a short distance from the body and moving in its direction and would have soon discovered it even if the defendant had not revealed its location.[23] While discussing proof under this doctrine, the Supreme Court stated, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment."[24]

In considering the elements of the inevitable discovery rule, the Eleventh Circuit Court of Appeals has established that "there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demon-

---

[18] See *Lee*, 270 Ga. at 800; *Carswell*, 268 Ga. at 533.
[19] See *Wong Sun v. United States*, 371 U. S. 471, 487-488 (III) (83 SC 407, 9 LE2d 441) (1963) (evidence derived from a constitutional violation by the police must be suppressed).
[20] See *Nix v. Williams*, 467 U. S. 431, 444 (II) (B) (104 SC 2501, 81 LE2d 377) (1984).
[21] See id. at 437.
[22] Id. at 448.
[23] Id. at 449-450.
[24] Id. at 445, n. 5.

strate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct."[25] Because this definition is consistent with the way our state appellate courts have applied the inevitable discovery rule, we expressly adopt it as our own rule.[26]

Applying these elements, we conclude that the evidence was too speculative to support the trial court's finding that the gun would have been inevitably discovered. Taylor did not live with her mother and, absent Taylor's statement, the State does not advance any reason why police would have interviewed her mother other than that they would have interviewed all of Taylor's friends, acquaintances, and family members for information about a .38 revolver. Captain Simmons testified at the probable cause hearing that the police learned of the mother's gun for the first time in Taylor's statement, and there is no evidence that they learned of a connection not resulting from her statement. Asked about the investigation plan after the discovery of the fingerprint match, Captain Simmons responded, "We were in the process at that time [of] getting our heads together on what to do, what route we were going to take and the interview was actually the first." The State then relies on the fact that Taylor's mother voluntarily turned over the gun when asked about it after Taylor's confession. Since Taylor's mother did not testify, it is unclear what was said to her at that time or what motivated her to turn over the gun. Without more information, her cooperation under different circumstances cannot be accurately predicted. The trial court's findings show an absence of demonstrated historical facts that the police were moving inevitably to the discovery of the gun absent Taylor's statement.[27]

The police also did not possess other lawful means of uncovering the gun prior to Taylor's statement.[28] Without more than the finger-

---

[25] *United States v. Terzado-Madruga*, 897 F2d 1099, 1114 (11th Cir. 1990); see also *United States v. Satterfield*, 743 F2d 827, 846-847 (11th Cir. 1984).

[26] See, e.g, *Davis v. State*, 262 Ga. 578 (4) (422 SE2d 546) (1992) (no inevitable discovery of drugs where police did not show that a search warrant would have been sought in response to child's telephone call to police about parents' possession of drugs); *Delay v. State*, 258 Ga. 229 (3) (a) (367 SE2d 806) (1988) (rifle sitting in plain view would have been inevitably discovered by the police as part of their protective sweep of crime scene, regardless of the defendant's non-*Mirandized* statement as to its location); *Gearin v. State*, 218 Ga. App. 390 (1) (461 SE2d 562) (1995) (methamphetamine in defendant's pocket would have been inevitably discovered regardless of the alleged invalid consent search of the pocket because the defendant was being arrested for DUI and would have been searched incident to arrest); *Barnett v. State*, 204 Ga. App. 491 (1) (b) (420 SE2d 43) (1992) (drugs would have been inevitably discovered because police had probable cause to locate and seize drugs due to defendant's unsolicited comment that drugs were hidden inside a seat back and the observation of officers of a suspicious slit cut into the seat back).

[27] See *Nix*, 467 U. S. at 445, n. 5.

[28] See *Terzado-Madruga*, 897 F2d at 1114.

print match on the cup, there was no probable cause to obtain a search warrant of the mother's trailer where Taylor did not live.[29] The trial court erred by finding that the gun would have been inevitably discovered.

4. The State argues an alternative reason for the admission of the .38 revolver if Taylor's statement is suppressed. In *Wilson v. Zant*,[30] this Court held that the "fruit" of a voluntary statement obtained in violation of *Edwards v. Arizona* is not subject to the exclusionary rule.[31] The *Wilson* holding was supported by a later United States Supreme Court decision, *Oregon v. Elstad*,[32] which held that the "fruit" of a voluntary *Miranda*-tainted statement need not be suppressed. The rationale for not suppressing the fruits of a voluntary statement taken in violation of *Miranda* and *Edwards* is that these cases announced prophylactic rules designed to protect suspects' Fifth Amendment rights, but the rules were not themselves constitutional.[33] Referring in *Elstad* to the admissibility of the fruit of a *Miranda*-tainted statement, the Supreme Court stated, "If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself."[34] The police in this case failed to honor Taylor's request for counsel, but they did not violate her Fifth Amendment right against coerced self-incrimination. Therefore, because the gun was the fruit of a voluntary statement, we conclude that it is admissible at Taylor's trial.[35]

We reject Taylor's argument that the recent United States Supreme Court case of *Dickerson v. United States*[36] requires a different result. Taylor argues that *Dickerson* undermined the rationale in

---

[29] See *Davis*, 262 Ga. at 584; *State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984); OCGA § 17-5-21 (a).

[30] 249 Ga. 373 (290 SE2d 442) (1982), overruled on other grounds by *Morgan v. State*, 267 Ga. 203 (2) (476 SE2d 747) (1996).

[31] See id. at 378-379; see also *Livingston v. State*, 264 Ga. 402 (6) (444 SE2d 748) (1994); *Ward*, 262 Ga. at 298; *Cotton v. State*, 237 Ga. App. 18, 20 (513 SE2d 763) (1999).

[32] 470 U. S. 298, 318 (105 SC 1285, 84 LE2d 222) (1985).

[33] See id. at 306-309; *Wilson*, 249 Ga. at 378; see also *Davis*, 512 U. S. at 462 ("We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance.").

[34] *Elstad*, 470 U. S. at 309; see also *Greenawalt v. Ricketts*, 943 F2d 1020, 1026-1027 (9th Cir. 1991) (holding that a voluntary confession inadmissible on the grounds of *Edwards* does not render its derivative evidence inadmissible); *United States v. Cherry*, 794 F2d 201, 207-208 (5th Cir. 1986) (suppression of statement due to *Edwards* violation does not require suppression of the murder weapon obtained as a result of that statement); *Martin v. Wainwright*, 770 F2d 918, 928 (11th Cir. 1985) (police failure to honor a suspect's request to "cut off" questioning does not make the fruits of the ensuing voluntary confession inadmissible).

[35] See *Wilson*, 249 Ga. at 378-379; *Cherry*, 794 F2d at 207-208.

[36] 530 U. S. 428 (120 SC 2326, 147 LE2d 405) (2000).

*Wilson* and *Elstad* because the Supreme Court held in *Dickerson* that "*Miranda* announced a constitutional rule"[37] and a constitutional violation in the taking of her statement would mandate the suppression of the gun.[38] The Supreme Court, however, discussed *Elstad* in the *Dickerson* opinion by stating, "Our decision in [*Elstad*] – refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases — does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."[39] Therefore, we conclude that the Supreme Court intends to preserve a distinction in the law permitting the fruits of voluntary statements taken in violation of *Miranda* to be admissible.[40]

*Judgment affirmed in part and reversed in part. All the Justices concur, except Benham, J., who concurs in Divisions 1, 2, 4 and in judgment.*

DECIDED OCTOBER 1, 2001.

*Harrison & Harrison, Stephen P. Harrison, Parker & Day, Vallerina F. Day*, for appellant.

*Tommy K. Floyd, District Attorney, Thomas R. McBerry, Assistant District Attorney*, for appellee.

---

[37] Id. at 444.
[38] See *Wong Sun*, 371 U. S. at 487-488.
[39] See *Dickerson*, 530 U. S. at 441.
[40] See *Tennessee v. Walton*, 41 SW3d 75, 90 (Tenn. 2001) ("We also disagree that *Dickerson* compels the conclusion that a violation of *Miranda* mandates a *per se* exclusionary rule for all fruits of that violation.").