**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 19, 2013**

# In the Court of Appeals of Georgia

A13A0837. CODY v. THE STATE.

PHIPPS, Chief Judge.

A jury found Mark Waddess Cody guilty of committing against his son's half-sister, S. H., six crimes: aggravated sodomy; two counts of aggravated child molestation; child molestation; and two counts of false imprisonment. Additionally, relating to his conduct during his arrest in connection with S. H.'s allegations, the jury found Cody guilty of obstruction of an officer and giving a false name to an officer. Convicted of these eight offenses, Cody contends that the trial court erred by admitting in evidence his police statement, by commenting on the evidence, by imposing certain sentences under an inapplicable version of a statute, by failing to merge certain offenses for sentencing purposes, and by sentencing him as a recidivist. Because Cody has shown no merit in any contention, we affirm.

The trial evidence showed the following.[1] On February 6, 2008, S. H.'s mother took her to the hospital because the 7-year-old complained of a stomach ache and had a foul-smelling, brownish vaginal discharge. Results of lab testing upon vaginal swabs from S. H. showed that she had contracted chlamydia. S. H.'s treating physician, who was qualified at trial as an expert in pediatric medicine, testified that chlamydia was typically contracted by sexual contact, and could cause abdominal pain and vaginal discharge. The discharge, the physician explained, had resulted from the cervix being infected with chlamydia.

Upon learning the diagnosis, S. H.'s mother asked S. H. whether anyone had inappropriately touched her; the child answered no. But S. H.'s mother pressed S. H., specifically asking whether anyone had placed his penis in her private part; she responded that a boy at a playground had done so. When her mother continued to ask questions, S. H. began crying and told her mother that, when she was five years old, Cody made her lie on their sofa at their "University" apartment while he touched her vagina and made her suck and play with his penis. S. H. told her mother that on a later occasion at their "Scottsdale" home, Cody held her down on her mother's bed and put his penis in her buttocks. And S. H. told her mother that on a third occasion, Cody

_____

[1] Cody neither testified, nor called any witness.

pulled her nightgown up and her underwear down and put his penis in her buttocks, again while in her mother's bedroom; on that occasion, her brother had answered her calls for help.

S. H.'s mother testified that Cody was the father of her other child, a boy about three years older than S. H, and that Cody often visited their home. Occasionally, Cody spent the night; she had continued a sexual relationship with Cody. Upon hearing S. H.'s allegations, the mother reported the disclosures and the medical diagnosis to the police.

Thereafter, on February 14, 2008, a social worker conducted a forensic interview of S. H. During the interview, S. H. described that, starting when she was five years old, Cody had touched her privates on three different occasions. She also stated that Cody had "humped" her, describing that "humping" meant "when somebody gets on top of you and goes up and down." S. H. recounted further that Cody had put his penis in her buttocks and that "I screamed my brother's name because it hurt." A video-audio recording of S. H.'s interview with the social worker was later played for the jury.

A warrant was issued for Cody's arrest. On March 3, 2008, two uniformed officers in a marked patrol vehicle spotted Cody walking through a residential

community. They exited the patrol vehicle, approached him, and asked him his name. Cody replied that his name was "Mark Smith." When one of the officers nevertheless handcuffed one of Cody's wrists, Cody jerked away from the officer's grasp, struck the officer in the chest, then fled on foot. The two officers gave chase and apprehended Cody, who was then fully handcuffed and placed in the back seat of the patrol vehicle. Another officer arrived at the scene, and in response to that officer's questions, Cody gave his correct name.

Cody was transported to a police station, where he was led into an interview room. Cody executed a form, acknowledging that he had been advised of, understood, and waived his Miranda rights. He then gave a statement to a police detective. During his statement, Cody said that he was 30 years old. He denied ever inappropriately touching S. H., denied ever having contracted chlamydia, and denied having had any sexually transmitted disease within the previous two years. Cody's police interview was audio-recorded and later played for the jury. After the police interview, a sample of Cody's urine was collected and tested for chlamydia; the results were negative.

At the time of the trial, S. H. was eight years old and in the third grade. She recalled that Cody often visited their home. She testified about three different episodes during which Cody had inappropriately touched her. The first episode

4

occurred when she was living at University apartments. She and her brother were watching television in their mother's bedroom; her mother was also there, but was asleep. Cody called S. H. into the living room, put her on the sofa, then put his private part into her mouth. S. H. testified, "He made me suck it." Also, S. H. testified, Cody "put his hand on my private – on the front of my private part. . . . He was touching the front of my private part." Afterward, Cody told S. H. not to tell her mother, and then he left the residence.

The second episode occurred when she was living in Scottsdale. S. H. recalled that she was then six years old. Her mother was at work; her brother had gone to the store with their grandmother; she had been left at home alone with Cody. "That day [Cody] was trying to hump me," she recalled. S. H. testified that she was wearing her nightgown and lying on her mother's bed. Cody entered the bedroom, wearing only a t-shirt and boxers. He removed his clothing, pulled down her panties, got on top of her body and "was trying to hump me." Afterward, he told her not to tell her mother or he and her mother would beat her.

The third episode occurred when she and her brother were alone with Cody at their Scottsdale home. Cody directed S. H. into her mother's bedroom, and she complied. She was wearing a nightgown and panties; she lay on her mother's bed and

5

began watching television. Her brother was in his bedroom, playing a video game. Cody went to his son's bedroom and told the boy to turn up the volume on the game. Then Cody entered the bedroom with S. H. S. H. testified that Cody got on the bed and "came behind me and pulled me towards his private part." Cody lifted her nightgown, pulled down her panties, and "put his private part in my back part." She yelled for her brother, who came to the bedroom, pulled her from under Cody and out of the covers, then returned to his bedroom. S. H. recalled that Cody picked her up and put her back into the bed. Cody attempted to get on top of her again; she called for her brother; her brother returned to the room and pulled her out again. Afterward, Cody told S. H. not to tell her mother what had occurred, and threatened to beat her if she told her mother.

S. H. testified about the day her mother asked her whether anyone had inappropriately touched her. She initially answered that no one had inappropriately touched her, then she said that a boy at a playground had done so. S. H. testified that she had told those lies because "I was scared from what [Cody] had said to me."

S. H.'s brother was 11 years old and in the sixth grade at the time of the trial. The boy recalled that his father, Cody, would sometimes visit and spend time with him and S. H. at their home. The boy recalled an occasion when Cody and S. H. were

6

in his mother's bed under the covers and he tried to pull S. H. out of the bed, but Cody was holding her. The boy had been in his bedroom, playing a video game; Cody had come to his room and instructed him to turn up the volume on the game, and the boy had complied. Cody then went to the mother's bedroom with S. H., and soon S. H. was calling for him. When he went to that bedroom, he found Cody and S. H. "under the cover . . . [r]ight there next to each other. . . . They was touching." The boy pulled the cover off the two, and saw that Cody's arms and legs were around S. H. Cody was wearing only a t-shirt and underwear. The boy testified that he began "trying to pull her out from under the cover because he was holding her." Later, after he had returned to his room, S. H. called him again; he returned to his mother's bedroom, where he again tried to pull S. H. away from his father.

The jury returned guilty verdicts on all eight counts of the indictment: Count 1, aggravated sodomy, by performing a sexual act involving the sex organs of Cody and the anus of S. H.; Count 2, aggravated child molestation, by inserting his penis into S. H.'s anus, causing injury and pain to child's anus; Count 3, aggravated child molestation, by touching his penis to S. H.'s vagina; Count 4, false imprisonment, by confining and detaining S. H., said act being separate and distinct from the act alleged in Count 5; Count 5, child molestation, by rubbing his penis on S. H.'s vaginal area,

7

with the intent to arouse and satisfy his sexual desires; Count 6, false imprisonment, by confining and detaining S. H., said act being separate and distinct from the act alleged in Count 3; Count 7, obstruction of an officer, by obstructing and hindering a law enforcement officer in the lawful discharge of the officer's official duties by striking and running from the officer; and Count 8, giving a false name, by providing the false name to an officer in the lawful discharge of his official duties and with the intent to mislead the officer as to his identity.

1. Cody contends that the trial court erred by failing to exclude his police statement. He concedes that he was properly informed of his rights under *Miranda v. Arizona*.[2] However, Cody claims that he unambiguously asserted his right to counsel, but was not afforded counsel before giving the statement. Therefore, he claims that his police statement was inadmissible.

Because Cody's police interview was audiotaped and there are no relevant controverted facts in the record, the trial court's application of the law to the undisputed facts is subject to de novo appellate review.[3]

---

[2] 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[3] *McDougal v. State*, 277 Ga. 493, 497 (1) (591 SE2d 788) (2004) (determining that, where almost the entire exchange between police and the accused was audiotaped and no question had been raised about witness credibility, and the

8

At the beginning of the interview, the detective stated his name, the date and time, and that he and Cody were in a police interview room. In response to the detective's questions, Cody stated his name, that he was not under the influence of any drug or alcohol, that he could read and write English, that he had attended school through the eleventh grade, and that he had thereafter earned his GED. Cody initialed a form acknowledging that information. The detective then provided Cody a "Statement of Miranda Rights" form, which the detective read aloud after asking Cody to follow along,[4] then asked Cody to sign a form so as to acknowledge that "I have read the above statement of my rights and I understand each of those rights." The detective then asked Cody, "You understand, right? Okay, sign right there [on the form]." The following colloquy ensued:

CODY: Can I get a lawyer now? Right now?

evidence was uncontroverted, the trial court's application of the law to undisputed facts was subject to de novo appellate review); see *State v. Brown*, 287 Ga. 473, 476 (2) (697 SE2d 192) (2010); *Taylor v. State*, 274 Ga. 269, 272 (1) (553 SE2d 598) (2001).

[4] The officer read, as was provided upon the form: "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him/her present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements."

DETECTIVE: We won't be able to provide you one right now. We can, uh, we can, you can ask for a public defender and we can do the interview later. That's your choice.

CODY: I would rather go on and get this over with, man, 'cause I don't understand why she is doing this.

DETECTIVE: Okay. Before we, uh – I'm, tell you what, let's just go ahead with this part of the line then we'll clarify that up what you said. Uh, this is the waiver of rights, saying, having these rights in mind, you waive and give up these rights and willingly make a statement. So, for us to – uh, for you to make a statement, talk about you know what may be going on here, if you feel that she's doing something to you, or, or if you have any information to give me, I would definitely love to get that information, because I'm not going to have it without talking to you. But uh, uh, again you know you're gonna have to, uh, uh, sign the form and be ready to talk.

[Cody signs form.]

CODY: [Unclear]

DETECTIVE: Okay. Last thing I just want to uh, clarify what you said. Uh, uh, I can't provide a lawyer this second, what we could do is you can ask a public defender to come at a later time, and the interview can be conducted at a later time. You've indicated that you'd like to not do that and you want to just go ahead and make a statement now and talk about this now, is that correct?

CODY: Um, yeah.

DETECTIVE: That's correct?

CODY: Yeah. I want to know what's going on. I don't know what's going on. I do not even know what the charges is.

10

From there, the detective proceeded with substantive questions pertaining to S. H.'s allegations.

On appeal, Cody claims that, although he denied during the interview ever sexually or otherwise inappropriately touching S. H. and also denied having contracted any sexually transmitted disease within the preceding two years, harmful facts were nonetheless revealed during the interview. Cody cites his statements that he had contracted and been cured of a sexually transmitted disease (although not chlamydia) during his teenage years; that he had been in the bed with S. H. while the two of them and his son watched movies, wrestled or played together; and that S. H. may have seen him shirtless, but wearing undershorts.

Cody maintains that the jury should not have been presented with his incriminating police statement, arguing that, upon being advised of his *Miranda* rights, he unambiguously invoked his right to counsel with the statements: "Can I get a lawyer now? Right now?" "A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available *or until the suspect reinitiates*

11

*the conversation*."[5] Thus, even when an arrested suspect has unequivocally invoked his right to counsel, it does not necessarily follow that any subsequent police statement must be excluded.[6] "Instead, the law requires analysis of whether, after a request for counsel, the police subjected the defendant to *further interrogation*, and, if so, whether the additional questioning was initiated by the defendant rather than the police."[7]

Even accepting (for the sake of argument) Cody's claim that his statements – "Can I get a lawyer now? Right now?" – constituted an unambiguous request for counsel,[8] the circumstances require us to consider whether the detective subjected

---

[5] *Taylor*, supra at 271-272 (1) (emphasis supplied), citing *Edwards v. Arizona*, 451 U. S. 477, 484-485 (101 SCt 1880, 68 LE2d 378) (1981) (holding, inter alia, that during a custodial interrogation, where accused has expressed the desire to deal with the police only through counsel, the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police").

[6] *Brown*, supra, citing *Edwards*, supra, and *McDougal*, supra at 498 (1).

[7] *Brown*, supra (emphasis in original).

[8] See *Taylor*, supra at 271-272 (1) (recognizing that a suspect's desire for counsel may not be ambiguous simply because it was articulated in the form of a question, and noting that "it is common for people to ask for things by saying 'Can I have . . .?'"). See generally *Davis v. United States*, 512 U. S. 452, 458-59 (114 SCt. 2350) (129 LEd2d 362) (1994) (explaining that whether a defendant has invoked his

12

Cody to further interrogation and whether the additional questioning was initiated by Cody rather than the detective.[9]

> In this context, "interrogation" is defined as "express questioning by law enforcement officers" or its functional equivalent – "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[10]

"The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."[11]

Here, the detective's immediate response to Cody's questions – "Can I get a lawyer now? Right now?" – did not fall within that definition of "interrogation."[12]

___

right to counsel is an objective inquiry).

[9] See *Brown*, supra; see *Smith v. Illinois*, 469 U. S. 91, 98 (105 SCt 490, 83 LE2d 488) (1984) (instructing that invocation of counsel and waiver of counsel are entirely distinct inquiries).

[10] *Brown*, supra at 476-477 (2) (citations and punctuation omitted).

[11] *Rhode Island v. Innis*, 446 U. S. 291, 301 (II) (A) (100 SCt 1682, 64 LE2d 297) (1980); see *Brown*, supra at 477 (2).

[12] See *Brown*, supra (determining that, after the suspect invoked his right to counsel, the detectives' words and actions that answered or deflected a number of direct questions from the suspect regarding what he would be charged with, when he could go home, whether he would be arrested, when he could use the phone, how the victim was doing, and where he would go next, did not constitute interrogation or its

13

The detective's response neither expressly questioned Cody nor equated to words or actions that the detective should have known were reasonably likely to elicit incriminating information from Cody.[13] Furthermore, the additional questioning that ensued was initiated by Cody; that is, after hearing the detective's response, Cody revealed to the detective, "I would rather go on and get this over with . . . ."[14]

---

functional equivalent); *United States v. Briggs*, 273 F3d 737, 740-741 (7th Cir. 2001) ("A police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'") (citations and punctuation omitted), cited in *Brown*, supra at 477 (2). See generally *Miranda*, supra at 474 (rejecting the suggestion "that each police station must have a 'station house lawyer' present at all times to advise prisoners").

[13] See generally *Innis*, supra ("'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."); *Cook v. State*, 270 Ga. 820, 825 (2) (514 SE2d 657) (1999) (noting that the "[United States] Supreme Court has expressed particular concern about deceit or trickery during a police interrogation, such as using psychological ploys . . . to subjugate the individual to the will of the examiner").

[14] See *Walton v. State*, 267 Ga. 713, 716-718 (3) (4) (482 SE2d 330) (1997) (explaining that an accused may waive his previously-invoked right to counsel if he "initiates further communication, exchanges, or conversations with the police" and that "an accused's response to an officer's answer to a question posed by the accused is not the product of custodial interrogation"), disapproved on other grounds, *Toomer v. State*, 292 Ga. 49, 57 (2) (c) (734 SE2d 333) (2012). Cf. *Taylor*, supra at 271-272 (1) (2001) (determining that the arrested suspect's statement, "Can I have a lawyer present when I [tell police my version of what happened]?" followed by "Okay" when told she could, was an unambiguous request for counsel).

14

A divided U. S. Supreme Court addressed the issue of "initiating conversation" in *Oregon v. Bradshaw.*[15] A four-justice plurality held that an accused initiates conversation when he "evince[s] a willingness and a desire for a generalized discussion about the investigation."[16] Four other justices believed that an accused initiates conversation when he "reopens the dialogue about the subject matter of the criminal investigation."[17] Eight of the nine justices agreed that the "initiation" question was the first of a two-step process for determining whether an accused had waived the right to counsel – even if the accused initiated the conversation, there must then be an inquiry whether a valid waiver of the rights to counsel and to remain silent occurred.[18]

"Whether there was a wavier of the previously-invoked right to counsel is based upon the totality of the circumstances."[19]

Here, after Cody revealed that he "would rather go on and get this over with," the detective's statements and actions were permissibly aimed at clarifying Cody's apparent decision to waive the right to counsel and the right to remain silent, and thus

---

[15] 462 U. S. 1039 (103 SCt 2830, 77 LEd2d 405) (1983).

[16] Id. at 1045-1046.

[17] Id. at 1054.

[18] *Walton*, supra at 716 (3), citing *Bradshaw*, supra at 1044-1045, 1055, n. 2.; see *McDougal*, supra at 499-500 (1).

[19] *McDougal*, supra at 500 (1) (footnote omitted).

15

proceed with the interrogation without counsel.[20] Indeed, Cody thereupon affirmed his decision – orally and by executing a written waiver – to give up those rights and proceed with un-counseled interrogation.[21] Under the totality of these circumstances, the trial court did not err in admitting Cody's police statement.[22]

---

[20] See *Smith*, supra at 100 (explaining that statements subsequent to a request for counsel are relevant to the distinct question of waiver of counsel); *Walton*, supra; see further *Brown*, supra at 477-480 (2). See generally *Davis*, supra at 461 (II) (noting that, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney").

[21] See *Bradshaw*, supra at 1045-1047 (concluding that suspect waived previously-invoked right to counsel after suspect re-initiated conversation and was informed by officer that he did not have to speak to the police and suspect indicated that he understood); *Brockman v. State*, 263 Ga. 637, 638-639 (1) (b) (436 SE2d 316) (1993) (concluding that suspect waived previously-invoked right to counsel when he re-initiated conversation with police, volunteered information, was re-advised of his *Miranda* rights, and executed a written waiver); *Sanders v. State*, 182 Ga. App. 581, 582-583 (1) (356 SE2d 537) (1987) (determining that suspect waived previously-invoked right to counsel when he reinitiated conversation with the police, was reminded that he had asked for a lawyer, and said he wanted to continue making a statement); cf. *McDougal*, supra at 500 (1) (finding no waiver of previously-invoked right to counsel, where suspect summoned detectives but made no mention of an attorney, and suspect's only statements were in response to detective's interrogation).

[22] See *Bradshaw*, supra; *Brown*, supra at 480 (2); *Brockman*, supra; *Sanders*, supra. See generally *Davis*, supra (reiterating that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may question a suspect until and unless the suspect clearly requests an attorney); *Gonzalez. v. State*, 283 Ga. App. 843, 845-848 (2) (b) (643 SE2d 8) (2007) (rejecting appellant's argument that she requested, but was denied, an attorney, where she stated at the start of the police

16

2. Cody contends that the trial court violated OCGA § 17-8-57[23] during the final charge when it instructed the jury regarding Count 3 of the indictment. That count alleged that Cody committed aggravated child molestation, by "touching his penis to [S. H.'s] vagina, with the intent to arouse and satisfy the sexual desires of the accused; said act causing physical injury to the child, to wit: giving the child a sexually transmitted disease."

Cody specifically contests these instructions:

> For the purpose of aggravated child molestation in determining whether the child was injured, you may consider whether said child contracted a sexually transmitted disease from the defendant. The question of whether or not the child contracted a sexually transmitted disease from the defendant is a determination solely for you, the jury, to decide.

According to Cody, these instructions violated OCGA § 17-8-57 because the trial court effectively told the "jury that if Appellant had given the alleged victim a

---

interview, inter alia, "If I talk to a lawyer uh when is he gonna be present? . . . So I can talk to him right now?" followed by "But I don't know" when told that she could, and where the police officer advised the accused that "the court will appoint you an attorney. But uh that's not gonna happen today. It's a big decision to make. But it's your choice you know," and accused ultimately said, "Ask me questions.").

[23] ("It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. . . .")

sexually transmitted disease, then this fact could satisfy the essential element of physical injury as alleged."

Cody cites no authority that OCGA § 17-8-57 was thereby violated, and we find none.[24] Having read as a whole the trial court's final charge, we conclude that the flagged language did not violate the cited statute.[25]

3. Cody contends that the "life" sentences imposed on the two counts of aggravated child molestation were not authorized by law.

Cody points out that, effective July 1, 2006, the General Assembly amended OCGA § 16-6-4 so as to allow a sentence of life in prison.[26] Prior thereto, the statute provided for punishment of "imprisonment for not less than ten nor more than 30

---

[24] Nor does Cody claim that he challenged the sufficiency of the indictment on the ground that the count failed to allege the material element of "physical injury" under OCGA § 16-6-4 (c) when it charged that he gave the victim a "sexually transmitted disease."

[25] See *Carter v. State*, 269 Ga. 891, 893 (6) (506 SE2d 124) (1998) (rejecting contention that language in final charge violated OCGA § 17-5-7, where a review of the charge as a whole revealed that the charge did not attempt to tell the jury what had been shown by the evidence, but instead made clear that jury was the ultimate arbiter of fact).

[26] Ga. L. 2006, p. 379, §§ 11, 30.

years."[27] Citing *Ewell v. State*,[28] Cody claims that the "life" sentences must be vacated and the case remanded for resentencing, asserting that, given the evidence, a possibility exists that the jury found him guilty of crimes that occurred *before* the amendment's July 1, 2006 effective date, such that the "life" sentences were not authorized.[29] This claim is without merit.

The two counts of aggravated child molestation each alleged that the offenses occurred *after* the July 1, 2006 effective date: "between the 1st day of November, 2006, and the 30th day of September, 2007, the exact date of the offense being unknown."[30] Regarding those counts, S. H. testified that the underlying episodes occurred at their Scottsdale home. S. H.'s mother's testified that the family (the

---

[27] OCGA § 16-6-4 (d) (1) (2005); Ga. L. 1997, p. 1578, § 1.

[28] 318 Ga. App. 812, 816 (3) (b) (734 SE2d 792) (2012).

[29] See *Fleming v. State*, 271 Ga. 587, 590 (523 SE2d 315) (1999) ("[I]n general, a crime is to be construed and punished according to the provisions of the law existing at the time of its commission" and that "a law is ex post facto if it inflicts upon the party a greater punishment than the law annexed to the crime at the time it was committed.") (citations and punctuation omitted).

[30] Cody points out the trial court instructed the jury during its final charge, "The exact date of a crime is not a material allegation of the indictment. The crime may be proved to have taken place on any date prior to the return of the indictment so long as the date is within the applicable statute of limitations."

mother, S. H., and S. H.'s brother) moved (out of the University apartments and) to their Scottsdale home in September 2006.

Given the foregoing, the trial court did not err in sentencing Cody pursuant to that version of OCGA 16-6-4 effective July 1, 2006; Cody's reliance upon *Ewell* is misplaced, as that case is inapposite.[31]

4. Citing *Drinkard v. Walker*,[32] Cody contends that the trial court erred by failing to merge various counts.

(a) Cody argues that the trial court should have merged Count 1, which alleged that he committed aggravated sodomy (by performing a sexual act involving his sex organs and S. H.'s anus), into Count 2, which alleged that he committed aggravated child molestation (by inserting his penis into S. H.'s anus, an act that caused injury and pain to the child). Cody posits that both counts were "based on the same act of

---

[31] Compare *Ewell*, supra at 817 (3) (b) (determining that a possibility existed that the jury convicted the appellant based on acts that occurred prior to the enactment of the life sentence provision, where "the date range in the indictment . . . span[ned] both versions of OCGA § 16-6-4 (d)," and where "[a]t trial, neither the evidence presented nor [the victim's] testimony identified a specific date or dates within the range listed in the indictment on which the [aggravated child molestation] occurred").

[32] 281 Ga. 211, 215-217 (636 SE2d 530) (2006) (holding that certain offenses may be merged and multiple punishment may be precluded, when the same conduct establishes the commission of more than one crime).

20

sodomy," and that Count Two merely "alleged the additional elements of Appellant's intent to arouse and satisfy his sexual desires and the causing of physical injury to the victim, to wit: pain to the victim's anus."

There is no merit in this argument. Supporting two separate convictions, the state adduced S. H.'s testimony and out-of-court statements concerning Cody's sexual conduct during the second and third episodes.[33]

(b) Cody contends that the trial court erred by failing to merge Count 5, which alleged child molestation (by rubbing his penis on S. H.'s vaginal area), into Count 3, which alleged aggravated child molestation (by touching his penis to S. H.'s vagina, thereby causing injury of sexually transmitted disease). Cody posits, "The only additional element in Count Three was that [he] caused physical injury to the child, to wit: a sexually transmitted disease."

There is no merit in this argument. Supporting two separate convictions, the state adduced S. H.'s testimony and out-of-court statements concerning Cody's sexual conduct during the second and third episodes.[34]

---

[33] See *Yates v. State*, 298 Ga. App. 727, 730 (3) (681 SE2d 190) (2009) (distinguishing *Drinkard*, supra, and explaining that "where the crimes charged are based on more than one separate act or transaction, no merger is required").

[34] See id.

5. Cody contends that the trial court erred by sentencing him as a recidivist under OCGA § 17-10-7 (a).

Seeking recidivist punishment, the state introduced at the sentencing hearing certified copies of two previous felony convictions for Cody: a 1995 burglary conviction and a 2004 second-degree criminal damage to property conviction.

(a) Although conceding that he had been convicted of prior felony offenses, Cody argues that he had not been "sentenced to confinement in a penal institution" as contemplated by OCGA § 17-10-7 (a), citing that his prior sentences were either wholly or in part suspended or probated. This argument has already been rejected.[35] "Since [Cody] was sentenced to . . . confinement in a penal institution with the privilege of serving it on probation, his sentence was in compliance with OCGA § 17-10-7 (a)."[36]

(b) Cody asserts that the trial court failed to exercise its discretion to consider whether to probate or suspend the maximum sentences of life imprisonment, as authorized by OCGA § 17-10-7 (a). "[U]nless affirmative evidence shows otherwise,

[35] See, e.g., *Cook v. State*, 305 Ga. App. 516, 518 (2) (699 SE2d 831) (2010); *Johnson v. State*, 272 Ga. App. 294, 295 (3) (612 SE2d 29) (2005); *Bennett v. State*, 132 Ga. App. 397, 398-399 (3) (208 SE2d 181) (1974).

[36] *Cook*, supra.

the trial court is presumed to have exercised its discretion in imposing sentence."[37]

Cody cites no such evidence; moreover, the transcript of the sentencing hearing reveals that the trial court expressly noted the language affording judicial discretion. Cody has demonstrated no basis for disturbing the sentences imposed.[38]

*Judgment affirmed. Ellington, P. J., and Branch, J., concur.*

---

[37] *Paige v. State*, 277 Ga. App. 687, 688-689 (2) (627 SE2d 370) (2006) (citation and punctuation omitted).

[38] See *Morrison v. State*, 256 Ga. App. 23, 26 (5) (567 SE2d 360) (2002) (interpreting OCGA § 17-10-7 (a) as providing that an individual who has previously been convicted of a felony shall be sentenced upon conviction of a subsequent felony to the maximum prescribed punishment for that offense, although the trial court may suspend or probate part or all of the sentence).