296 Ga. 764
FINAL COPY

S14A1375, S14X1376.  THE STATE v. CHULPAYEV; and vice versa.

NAHMIAS, Justice.

On May 21, 2013, a Fulton County grand jury indicted Mani Chulpayev for the murder of Melvin Vernell III and related crimes.  The indictment also charged four other men, including Decensae White and Gary Bradford, with the murder and related crimes.  On October 9, 2013, Chulpayev filed a pretrial motion to suppress statements that he made during interviews with Federal Bureau of Investigation (FBI) agents and Sandy Springs Police Department (SSPD) officers on July 30, 2012, October 24, 2012, and April 12, 2013, raising claims under both OCGA § 24-8-824 and the Constitution.  After a four-day evidentiary hearing, the trial court granted the suppression motion as to the July and October 2012 interviews, ruling that Chulpayev's statements were involuntary and thus inadmissible under OCGA § 24-8-824.  But the court denied the motion as to the April 2013 interview, ruling that Chulpayev's statements after his arrest that day were not involuntary under OCGA § 24-8-824 and that any taint from his previous statements had been eradicated.

In Case No. S14A1375, the State appeals the partial grant of Chulpayev's

suppression motion, and we affirm the trial court's rulings based on OCGA § 24-8-824. In Case No. S14X1376, Chulpayev cross-appeals the partial denial of the suppression motion. We conclude that the trial court erred in its taint analysis, although it ultimately reached the right result as to Chulpayev's statutory claim because statements that are inadmissible under OCGA § 24-8-824 do not taint evidence derived therefrom. The trial court did not decide whether Chulpayev's statements were obtained in violation of his constitutional rights, however, so we must vacate the court's judgment as to the April 2013 statements and remand the case for the court to rule on the constitutional claim.

1.    Viewed in the light most favorable to the trial court's findings and judgment, see Brown v. State, 293 Ga. 787, 802 (750 SE2d 148) (2013), the evidence presented at the suppression hearing showed the following.

The Murder and Initial Investigation

On the evening of June 7, 2012, SSPD officers responding to a 911 call found Vernell, who had been shot and killed while sitting in an Audi sedan in a parking lot at Northside Hospital. The officers identified and notified the owner of the Audi, and around midnight, the owner called Chulpayev, whose car rental business had rented the car to Vernell. About 30 minutes later, Chulpayev

called the SSPD, identified himself, and provided some information about the car. The next day, June 8, Chulpayev called FBI Special Agent Dante Jackson about the shooting. Chulpayev had served as a confidential informant (CI) for the FBI and other federal agencies since 1998 and had been working with Agent Jackson since November 2009. At the time of the murder, he was helping Agent Jackson investigate alleged drug-related gang activity involving White, Bradford, and Vernell's father. During the June 8 call, Chulpayev told the agent that he believed White and Bradford had killed Vernell for stealing their marijuana. Agent Jackson told Chulpayev not to speak to anyone at the SSPD.

On June 11, 2012, Agent Jackson called Detective J.T. Williams, the SSPD's lead investigator on the case, and repeated what Chulpayev had said about White and Bradford, explaining that the FBI was investigating them as part of a gang transporting drugs from the west coast to Atlanta. Agent Jackson told Detective Williams that he was very protective of his CI and wary of interference by local police. After Detective Williams agreed not to interfere with the CI and to "do nothing to put him in harm's way," Agent Jackson gave the detective Chulpayev's name, told the detective that Chulpayev had been deemed "credible and reliable" in the past, and gave the detective permission to

3

use the information supplied by Chulpayev to get court orders for White's and Bradford's cell phone records. Agent Jackson and Detective Williams agreed that the FBI would continue to work the gang case and, if they got enough evidence to connect the murder to that case, the entire case would be indicted federally.

Chulpayev's July 2012 Statements to the FBI

During the remainder of June and into July 2012, Agent Jackson continued to work with Chulpayev to investigate White and Bradford, although the SSPD also pursued other leads in Vernell's murder.[1] Chulpayev's cell phone records show that he and Agent Jackson exchanged multiple text messages on a nearly daily basis during this period. At the suppression hearing, Chulpayev also testified that, at that time, he and Agent Jackson exchanged between 70 and 100 phone calls monthly. Agent Jackson represented himself to Chulpayev as the lead investigator on the murder case.

---

[1] The SSPD originally believed that Vernell's murder was related to a feud between Vernell, who was a rapper, and some rappers from Baton Rouge associated with his father's record label. On June 22, 2012, the SSPD tipline got a call with information about Vernell's murder. Because Detective Williams was traveling at the time, he passed the caller's name and number on to Agent Jackson. When the agent called the tipster, the person corroborated Chulpayev's story that Vernell was killed for stealing marijuana. The tipster did not mention Chulpayev.

4

On July 27, Agent Jackson sent Chulpayev a text message saying, "Stay where you are until you hear from me. I'm heading to Sandy Springs PD for a meeting with the chief. To hold off on a murder warrant." According to Chulpayev, Agent Jackson told him in conversation that he needed to come to the FBI office and give a truthful statement because the SSPD was planning to take out a warrant against him for murder and Jackson could not protect him without knowing everything. Agent Jackson said that he would "keep the murder warrant off" if Chulpayev talked to them. The interview took place on July 30, 2012, at an FBI office in Atlanta. Chulpayev drove himself to and from the interview, which was audio recorded. Agent Jackson, another FBI agent, and an Alpharetta police officer who had been assigned to the FBI gang task force were present.

At the suppression hearing, the other FBI agent and the Alpharetta officer both testified that Chulpayev was advised of his rights under Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), and said he understood them before the audio recording began, although he did not sign an advice of rights form. The agent also testified that Chulpayev was treated as a "source" during the interview, and the officer testified that Agent Jackson

5

represented to Chulpayev that Chulpayev would continue to be a confidential informant on the case and his identity would be disclosed only if he had to testify as a witness. Agent Jackson invoked his Fifth Amendment right against self-incrimination and refused to testify at the suppression hearing.[2]

During the July 30 interview, Chulpayev reiterated his earlier statements to Agent Jackson that White and Bradford had killed Vernell because they suspected Vernell of stealing their marijuana. Chulpayev also said, apparently for the first time, that two or three days before the murder, White called and asked him to locate Vernell's car using the GPS tracker that was installed on all cars Chulpayev rented out. When Chulpayev asked what White was planning to do, White said he just wanted to talk to Vernell, so Chulpayev tracked the car for White, locating it at a hotel on Peachtree Industrial Boulevard. Chulpayev denied ever tracking the car to the hospital where Vernell was killed, and Chulpayev said that he did not expect White to harm Vernell. Near the end of the interview, Chulpayev explained to Agent Jackson that he had not shared the

---

[2] Jackson was by then under investigation by the FBI based on allegations that his relationship with Chulpayev was improper. According to Chulpayev's April 2013 statements to the SSPD, that internal investigation began around February 2013 and resulted in Jackson's reassignment and the FBI's stopping its investigation into White and Bradford.

extent of his relationship with White earlier because he was worried that it would look bad that he was making money off of White, who had brought in car-rental customers. Agent Jackson told Chulpayev that how he made his money was not important, saying, "What I think is important is two things, one, to keep you alive and keep you out of jail. Those are the only two things I care about. Those are the things and then lo[c]king them up for murder. I got three things that I have to be concerned about."

Chulpayev's October 2012 Statements to the SSPD

More than two months later, on October 15, 2012, Agent Jackson told Detective Williams and other SSPD detectives about the July interview with Chulpayev, including that Chulpayev had said that he tracked Vernell's car for White before the murder. When the detectives suggested that this might make Chulpayev a party to the crime, Agent Jackson responded that they could charge Chulpayev only for "the cars." Later that day, Agent Jackson called Detective Williams, "cussed [him] out," and vowed to protect Chulpayev "at all costs."

Agent Jackson agreed to let Detective Williams interview Chulpayev at the FBI office on October 24, 2012, but with the understanding that Chulpayev would be treated as a confidential informant and used as a witness only if

necessary. According to Chulpayev's testimony, prior to the interview, Agent Jackson told Chulpayev that an investigator at the SSPD "had it out" for him. Agent Jackson assured Chulpayev, however, that he had nothing to worry about, saying, "I'm the lead on the case, and as much as you do for me, you know, I will make sure nothing happens to you. . . . I got you. Just come and do what I'm asking you to do." Chulpayev then agreed to the interview. He drove himself to the FBI office and was escorted to the interview room by Agent Jackson, who also escorted Detective Williams and his partner to the room. Agent Jackson did not stay in the room during the interview, but he remained close by and came in the room at the conclusion of the interview. He also sent Chulpayev a text message asking "are you ok" at some point during the interview.

During the interview, which was audio recorded, Detective Williams did not advise Chulpayev of his Miranda rights and did not tell him that he was suspected as a party to the murder. Instead, Detective Williams assured Chulpayev that he was "not in any trouble whatsoever," that the detective "was working with Dante [Jackson] on this," that Chulpayev was one of the "good guys," and that the detective "appreciate[d] everything that [Chulpayev had]

8

done." Detective Williams also confirmed that the murder investigation was "a joint operation" and Agent Jackson was "kind of the lead." The detective explained that he was interviewing Chulpayev so that he would have all the information Agent Jackson had. Chulpayev repeated what he had told Agent Jackson in July, including that he gave the location of Vernell's car to White two or three days before the murder and that he "didn't think [White] was capable" of killing Vernell.

Chulpayev's April 2013 Statements to the SSPD

On January 25, 2013, Detective Williams and his partner had a meeting with Agent Jackson and another FBI agent and asked Agent Jackson to set up a meeting with the U. S. Attorney's Office to discuss indicting the murder case federally. Later that night, Agent Jackson called Detective Williams and told him "off the record" that Chulpayev was not a registered, officially approved FBI CI and had not been for over two years, but Agent Jackson still used him on cases. An FBI internal investigation of Jackson apparently began shortly thereafter.

On February 22, Detective Williams obtained a court order for Chulpayev's cell phone records from June 2012. On February 27, the detective

obtained a warrant to search the Audi that Vernell had been driving for GPS tracking devices, rental agreements, and other documents, and the vehicle was searched the next day. All of the information about the trackers included in the search warrant affidavit was attributed to Chulpayev's October 24, 2012 statements to Detective Williams. The SSPD had obtained a search warrant for the Audi shortly after the murder eight months earlier, but no trackers had been found; the vehicle was still being held in a police impound lot. This time, when the car was searched, two GPS trackers were found inside, one inside the dashboard in front of the steering wheel and one behind the glove box. The SSPD then contacted the company that monitored the trackers and obtained the tracking records. The records showed that one of the trackers was accessed using Chulpayev's e-mail address, user name, and password seven times on the day before the murder and 14 more times on the day of the murder and indicated that the user of the device had purged or attempted to purge data from the server.

On April 10, based primarily on Chulpayev's statements in the October 2012 interview and the information garnered from the tracking devices found in the Audi, the SSPD obtained search warrants for Chulpayev's house, business, and car. The next day, an arrest warrant for Chulpayev was obtained

based on the same information.

On April 12, 2013, Chulpayev was arrested on murder and other charges and the search warrants were executed. At the time of the arrest, Detective Williams told Chulpayev that Agent Jackson was "out of the picture," which Chulpayev already knew. Chulpayev agreed to talk to Detective Williams and was taken to an interview room at the SSPD, where he was advised of his Miranda rights and acknowledged that he understood them. The interview was videotaped. Detective Williams explained that he was "not allowed to offer any hope or benefit" and that all he could do was tell the district attorney's office that Chulpayev had a "good heart" and "got it off [his] chest." Chulpayev acknowledged that his desire to speak was "free and voluntary" and then spoke with Detective Williams for about three-and-a-half hours.

Chulpayev reiterated that he tracked Vernell for White but did not know that White planned to kill Vernell. He also told the detective, for the first time, that at some point before the murder, he gave White the login and password to track the Audi. Chulpayev explained that he felt obligated to give White this information because White had given him a lot of money and they were "technically partners" on some car deals. Chulpayev also said that Agent

11

Jackson had prevented him from talking to the SSPD earlier even though he wanted to. Chulpayev expressed disappointment with Agent Jackson, saying of his federal handlers, "Nobody has given me anything that they have promised."

The Suppression Hearing and Order

At the suppression hearing, Chulpayev testified that Agent Jackson had repeatedly expressed that it was important to the agent to keep Chulpayev out of jail. Chulpayev testified that he made his statements in the July and October 2012 interviews to ensure that Agent Jackson would be able to protect him from a murder charge. In its order, the trial court concluded that Chulpayev's statements in the July and October 2012 interviews were involuntary and inadmissible under OCGA § 24-8-824. The court also concluded, however, that because five months passed between the October 2012 and April 2013 interviews, Agent Jackson was clearly out of the picture by that time, and Chulpayev was read his Miranda rights before agreeing to talk with Williams, "[a]ny possible taint was clearly eradicated" as to the April interview. This appeal and cross-appeal followed.[3]

[3] Although the trial court's February 4, 2014 order suppressing evidence was immediately and directly appealable by the State under OCGA §§ 5-7-1 (a) (4) and 5-7-2 (b) (1), the court granted the State a certificate of immediate review. The State filed a notice of appeal on February 14. On

12

2.     In its appeal, the State argues that the trial court erred in granting

Chulpayev's motion to suppress his July and October 2012 statements.  Under

Georgia statutory law, "[t]o make a confession admissible, it shall have been

made voluntarily, without being induced by another by the slightest hope of

benefit or remotest fear of injury."  OCGA § 24-8-824.  This provision of

Georgia's new Evidence Code tracks the language of OCGA § 24-3-50 of the

old Code.  Although the statute uses the term "confession," "[i]t has long been

the law in this State that the rule as to the admissibility of an incriminatory

statement is the same as that applied to a [full] confession."  Vergara v. State,

283 Ga. 175, 177 (657 SE2d 863) (2008).[4]  It has also long been understood that

"slightest hope of benefit" refers to "promises related to reduced criminal

---

February 18, Chulpayev filed an interlocutory application seeking to appeal the partial denial of the suppression motion, although he had not obtained a certificate of immediate review as required by OCGA § 5-6-34 (b).  He did not file a separate notice of cross-appeal, apparently because his lawyers believed that the application served that purpose.  See OCGA § 5-6-35 (j).  In any event, on April 14, Chulpayev filed a motion requesting an out-of-time cross-appeal, which the trial court granted.  See OCGA § 5-7-1 (b).

[4] Citing McMahon v. State, 308 Ga. App. 292, 293-294 (707 SE2d 528) (2011), the State contends that there is a distinction under the statute between full "confessions" and mere "incriminatory statements."  But McMahon failed to cite Vergara, relying instead on a 1954 Court of Appeals case of the sort Vergara overruled.  We now overrule McMahon as well.

13

punishment – a shorter sentence, lesser charges, or no charges at all." Brown v. State, 290 Ga. 865, 868-869 (725 SE2d 320) (2012). See also Bradshaw v. State, 296 Ga. 650 (769 SE2d 892) (2015) (explaining that where the new Evidence Code contains a provision that is not in the Federal Rules of Evidence and uses language "nearly identical" to a provision of the old code, "we give the new . . . provision the same meaning as the old one").

As discussed above, Chulpayev testified at the suppression hearing that Agent Jackson repeatedly indicated that he would protect Chulpayev from going to jail, and from a murder charge in particular, and the trial court credited that testimony.[5] Specifically, before the July 2012 interview, the FBI agent told Chulpayev that he would "keep the murder warrant off" if Chulpayev talked to

---

[5] The State argues that we should conduct a de novo review of the facts because the interviews with Chulpayev were recorded. De novo review would be appropriate if the "'controlling facts'" were undisputed because they were all discernable from the recordings. Vergara, 283 Ga. at 178 (citation omitted). Here, however, the legally controlling facts are in large part what occurred during the interactions between Chulpayev and Agent Jackson outside the interviews. These interactions were proved by testimony and other evidence, the credibility and weight of which the trial court as factfinder was entitled to determine. On appeal, we must accept those factual determinations unless they were clearly erroneous, although we independently review the court's application of the law to the facts. See Brown, 293 Ga. at 803. See also Hughes v. State, 296 Ga. 744, 746, n. 5 (770 SE2d 636) (2015) (explaining that the de novo review applied in Vergara is appropriate only "to the extent that material facts definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility"). Particularly in the absence of any contrary testimony from Agent Jackson, the trial court's findings as to the promises the agent made to Chulpayev are not clearly erroneous.

him. The other law enforcement officers involved in the interview testified that Chulpayev was treated as a confidential informant in the murder case, and the recording of the interview ends with Agent Jackson telling Chulpayev that one of the things the agent cared most about was "keep[ing] [Chulpayev] out of jail." Similarly, before the October 2012 interview, Agent Jackson told Chulpayev, "I'm the lead on the case, and as much as you do for me, . . . I will make sure nothing happens to you. . . . I got you. Just come and do what I'm asking you to do" — and what the agent was asking Chulpayev to do was agree to be interviewed by the SSPD detectives. Agent Jackson's representations that he was the leader of the murder investigation and that Chulpayev would not be in any trouble if he spoke to the SSPD officers were supported by Detective Williams during the interview. Chulpayev testified that, after these promises by the then-lead investigator on the case, he gave the July and October 2012 interviews so that Agent Jackson could protect him.

Accordingly, the record supports the conclusion that Chulpayev's statements during the first two interviews were induced by promises related to the potential criminal charges he faced, and the trial court did not err in suppressing those statements pursuant to OCGA § 24-8-824. See Foster v.

15

State, 283 Ga. 484, 487-488 (660 SE2d 521) (2008) (holding that a promise not to press additional charges against a defendant was an impermissible hope of benefit rendering his subsequent confession inadmissible).

## Case No. S14X1376

3.  In his cross-appeal, Chulpayev claims that the trial court erred in denying his motion to suppress his April 2013 statements to the SSPD, which he gave about two hours after he was arrested.  Chulpayev does not contend that these statements were themselves involuntary under OCGA § 24-8-824 or the Constitution.  Instead, he argues what he said during the April 2013 interview must be suppressed because it was "fruit of the poisonous tree" — derived from his involuntary July and October 2012 statements and the police's subsequent exploitation of those tainted statements.   See generally Wong Sun v. United States, 371 U. S. 471, 484-488 (83 SCt 407, 9 LE2d 441) (1963) (discussing the "fruits" extension of the exclusionary rule).

As explained below, the trial court did not correctly analyze Chulpayev's argument.  The court proceeded on the premise that the "fruits" doctrine applies to violations of OCGA § 24-8-824 and ruled that any taint from Chulpayev's previous statements obtained in violation of that statute was "clearly eradicated"

16

by the passage of five months between his October statements and his April statements and the <u>Miranda</u> warnings given to Chulpayev before the post-arrest interview. That taint analysis was erroneous, because as discussed in subdivision (a) below, the police clearly exploited Chulpayev's October statements to obtain his April statements, using what he told Detective Williams in October 2012 first to conduct the late February 2013 search that led to the GPS trackers in the victim's Audi and then to conduct the April 12, 2013 arrest that led to Chulpayev's final interview just two hours later, and this accumulation of taint could not be eliminated simply by administering <u>Miranda</u> warnings.

However, as discussed in subdivision (b) below, the trial court's decision that Chulpayev's April 2013 statements should not be suppressed on statutory grounds is right for a different reason, because the court's premise was incorrect. OCGA § 24-8-824 is an evidentiary statute based on a common law rule of evidence, and it requires the exclusion at trial only of incriminatory statements induced by a hope of benefit or fear of injury, not of evidence derived from such statements. Accordingly, Chulpayev's April 2013 statements were not suppressible based on any taint from prior violations of OCGA § 24-8-

17

824. This does not mean that the trial court's judgment denying suppression can be affirmed, however, because the court did not address Chulpayev's claim that his July and October 2012 statements were also involuntary and thus properly excluded under the related but distinct standard used to determine violations of constitutional due process, to which the fruits doctrine does apply. We therefore vacate the trial court's judgment as to Chulpayev's April 2013 statements and remand for a ruling on his constitutional claim.

(a) Under a "broad exclusionary rule" that encompasses the fruit of the poisonous tree doctrine, the court must suppress not only illegally acquired evidence but also evidence derived from the tainted primary evidence. Wong Sun, 371 U. S. at 485. But not all evidence is deemed fruit of a poisonous tree "simply because it would not have come to light but for the illegal actions of the police." (punctuation omitted) Id. at 487-488. The proper question is whether the challenged evidence "'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 488 (citation and punctuation omitted). Accord Vergara, 283 Ga. at 184. In deciding whether the primary taint was sufficiently dissipated, the court must consider the "'facts of each case,'" looking to such factors as "'the time elapsed

18

between the illegality and the acquisition of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct.'" Spence v. State, 281 Ga. 697, 700 (642 SE2d 856) (2007) (citation and punctuation omitted). Accord Brown v. Illinois, 422 U.S. 590, 603-604 (95 SCt 2254, 45 LE2d 416) (1975).

In denying suppression of Chulpayev's April 2013 statements, the trial court assumed that the fruits doctrine as set forth in Wong Sun applied to the analysis of those post-arrest statements because the court had determined that Chulpayev's previous statements were obtained in violation of OCGA § 24-8-824 — even though the court did not rule on Chulpayev's claim that his previous statements were also obtained in violation of his constitutional rights and even though all of the fruits cases the court cited involved the taint arising from such a constitutional violation. The trial court then concluded that because five months passed between Chulpayev's statutorily involuntary October 24, 2012 statements and his post-arrest interview on April 12, 2013, Agent Jackson was out of the picture by that time, and Chulpayev was read his Miranda rights before agreeing to talk with Detective Williams, "[a]ny possible taint was clearly eradicated." Assuming that the fruits doctrine applies to Chulpayev's

19

inadmissible July and October 2012 statements — an assumption that we will later explain is incorrect with regard to violations of OCGA § 24-8-824 — the trial court's conclusion was erroneous, because the court's analysis overlooked the police's "exploitation of [the] illegality" between October 2012 and the post-arrest interview, and the mere passage of time does not cleanse the primary tainted evidence of its taint or prevent that taint from infecting its fruits.

The trial court analyzed the taint question as if Chulpayev simply came in for another interview with Detective Williams in April 2013, with nothing else relevant occurring since his previous interview except for Agent Jackson leaving the case. In fact, much more occurred in the interim. As detailed in Division 1 above, on February 27, 2013, a few weeks after the SSPD learned that Chulpayev was not a properly registered FBI confidential informant and Agent Jackson was taken off the case, the police searched the victim's Audi, looking for GPS tracking devices and documents. This search was the direct result of the police's use of Chulpayev's earlier statements, as demonstrated by the search warrant affidavit, which attributed the information about the trackers exclusively to Chulpayev's October 2012 statements to Detective Williams.

The record shows no intervening circumstances or voluntary acts by

20

Chulpayev or anyone else between October 2012 and the Audi search sufficient to eliminate the connection to the previous statements. The State offered no evidence, for example, that the owner of the Audi had come forward with information about the GPS trackers and consented to a search of the car. Compare <u>Spence</u>, 281 Ga. at 701-702 (concluding that evidence from a search that was initially based on an allegedly invalid search warrant was not tainted fruit because the defendant's roommate's "consent to search was an act of free will that was sufficiently attenuated from any assumed illegality of the officer's search").[6] And while the official misconduct here was not especially flagrant,

---

[6] Under the "inevitable discovery" exception to the constitutional exclusionary rule, "if the State can prove by a preponderance of the evidence that evidence derived from police error or illegality would have been ultimately or inevitably discovered by lawful means, then the evidence is not suppressed as fruit of the poisonous tree." <u>Taylor v. State</u>, 274 Ga. 269, 274 (553 SE2d 598) (2001). In its brief, the State argues that the discovery of the GPS tracking devices and Chulpayev's connection to them was inevitable simply because the victim's Audi has been kept in police custody since the time of the murder. However, the SSPD's search of the car shortly after the murder failed to find the two well-concealed GPS trackers, and there is no evidence that the police had considered searching the car again looking for such devices during the next eight months; the search came only after the police had obtained Chulpayev's statements about the trackers and after his protector, Agent Jackson, had been removed from the case. During oral argument before this Court, counsel for the State asserted for the first time that another suspect provided the same information as Chulpayev about the tracking devices in the Audi and that this suspect's information is what led the police to get the search warrant on February 27, 2013. The record indicates that this other suspect was interviewed in January 2013 and told the police that Bradford had the ability to track the victim's car. (It may be that this information came in response to questions based on what Chulpayev had previously told the SSPD about the tracking devices.) The suspect did not mention Chulpayev, and there is no record evidence indicating that the police followed up on his information. Moreover, it strains credulity for the State's attorney to assert that the police were actively pursuing this source of information, when the search warrant affidavit did not mention it and the State did not present this

21

the collective action of Agent Jackson in assuring Chulpayev that he would be protected and kept out of jail if he spoke to the investigators and Detective Williams in supporting those assurances and then exploiting the information that Chulpayev provided in response to them can hardly be condoned.

As a result, the evidence found in the Audi search, in particular the GPS trackers, was tainted by Chulpayev's July and October statements, as were the tracking records that the police then acquired using evidence gained from the Audi and from Chulpayev. And as demonstrated by the content of the arrest warrant affidavit Detective Williams submitted on April 10, 2013, Chulpayev's arrest on April 12 was likewise based almost entirely on Chulpayev's prior statements, the GPS trackers found in the Audi search, and the resulting tracker records. Again, the record shows no relevant intervening circumstances. The fruit of Chulpayev's detention, therefore, must also be treated as the fruit of his prior statements, unless the causal connection was otherwise eliminated. See

argument, much less offer evidence to support it, in the trial court or in its brief to this Court. In sum, the State has not established that the inevitable discovery doctrine applies by demonstrating "'a reasonable probability that the evidence in question would have been discovered by lawful means, . . . [or] that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct.'" Id. at 274-275 (citation omitted).

Taylor v. Alabama, 457 U.S. 687, 690 (102 SCt 2664, 73 LE2d 314) (1982) ("[A] confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." (citation and punctuation omitted)); Boatright v. State, 225 Ga. App. 181, 183 (483 SE2d 659) (1997) (concluding that because the defendant's arrest warrant was based on information obtained from an illegal search, the arrest was illegal and no evidence obtained as a result of it could be introduced at trial).

The State points out that before giving his post-arrest statements, Chulpayev was advised of his Miranda rights and indicated that he understood them and wanted to talk to Detective Williams. Absent a tainted arrest just two hours earlier, such indicia of a willingness to speak to the police might be seen as "sufficiently an act of free will to purge the primary taint" of the preceding police conduct. Wong Sun, 371 U. S. at 486, 491 (concluding that a statement made by a defendant who had been illegally arrested was admissible because he was released and then returned voluntarily several days later to make the statement). However, compliance with Miranda and avoidance of other conduct

23

that would itself render a suspect's statements involuntary is not sufficient to eliminate the taint from an improper arrest made a mere two hours earlier. See Taylor, 457 U. S. at 691-692 (holding that giving the defendant three Miranda warnings and allowing him a short visit with his girlfriend did not break the connection between his illegal arrest and the statement he gave six hours after he was arrested); Robinson v. State, 166 Ga. App. 741, 742-743 (305 SE2d 381) (1983) (holding that the causal connection between the defendant's illegal arrest and his confession was not broken by any intervening events when he was interrogated after being arrested and advised of his Miranda rights).

In sum, contrary to the trial court's conclusion, Chulpayev's April 2013 statements are the fruit of his July and October 2012 statements, which the court properly held were involuntary and inadmissible under OCGA § 24-8-824. Thus, the post-arrest statements would be inadmissible *if* the fact that the prior statements were obtained in violation of the statute mandates that their fruits must also be suppressed. But the statute does not mandate that result, as we will explain next.

(b) The broad exclusionary rule, with its fruit of the poisonous tree extension, operates only in limited circumstances, usually only where a

24

defendant's constitutional rights have been violated, because the exclusion of evidence that is relevant to a criminal prosecution is a potent remedy that "must be justified by an over-riding public policy expressed in the Constitution or the law of the land." Nardone v. United States, 308 U. S. 338, 340 (60 SCt 266, 84 LE 307) (1939). Thus, this Court has held that the exclusionary rule cannot be imposed as "a judicially-created remedy . . . absent a violation of a constitutional right." Lopez v. State, 274 Ga. 663, 665 (558 SE2d 698) (2002).

The legislature may also provide for the exclusion of evidence or its fruits as a matter of statutory law, but suppression is not required merely because evidence was obtained in violation of a statute. See, e.g., State v. Lampl, 296 Ga. ___ (__ SE2d __) (2015) (holding that a violation of statutory provisions limiting the scope of a grand jury's duties did not authorize as a remedy the suppression of testimony given before the grand jury); Tew v. State, 246 Ga. App. 270, 272-273 (539 SE2d 579) (2000) (physical precedent only) (holding that the exclusionary rule did not apply to evidence derived from marijuana used in a reverse drug sale that was illegal because a statute required the police to destroy or send away forfeited dangerous contraband, where the statute did not include a suppression remedy and was not "enacted to protect a defendant's

25

constitutional rights"). Instead,

> the exclusionary rule is an appropriate sanction for a statutory violation only where the statute specifically provides for suppression as a remedy or the statutory violation implicates underlying constitutional rights such as the right to be free from unreasonable search and seizure.

United States v. Abdi, 463 F3d 547, 556 (6th Cir. 2006). See also Sanchez-Llamas v. Oregon, 548 U. S. 331, 348 (126 SCt 2669, 165 LE2d 557) (2006) (explaining that "[t]he few cases in which we have suppressed evidence for statutory violations" involved evidence that "arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests"); Lampl, 296 Ga. at ___ ("Unless expressly authorized by statute, [the exclusion of evidence] generally 'cannot be imposed absent a violation of a constitutional right' . . . ." (citation omitted)).

The statute at issue in this case, OCGA § 24-8-824, is part of our new Evidence Code, appearing in the chapter collecting the rules regarding hearsay. There is no doubt that the statutory text mandates the exclusion from evidence of incriminatory statements obtained in violation of the statute at trial and in other proceedings in which the hearsay rules apply. See OCGA § 24-1-2 (setting forth the proceedings in which all or portions of the new evidence rules

apply); Parker v. State, 296 Ga. 586, 590-595 (__ SE2d __) (2015) (discussing OCGA § 24-1-2). Like its statutory predecessors, § 24-8-824 says plainly what is necessary "[t]o make a confession admissible":  a defendant's incriminating statement must be made "voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."  In accord with this directive, numerous appellate decisions have required the exclusion at trial of statements obtained in violation of the statute.  See, e.g., Canty v. State, 286 Ga. 608, 610-611 (690 SE2d 609) (2010); Foster, 283 Ga. at 488.

We must still determine, however, if the exclusion of the *fruits* of a statement obtained in violation of this statute is required by either the statute or the Constitution.  Looking first to the statute itself, OCGA § 24-8-824 prescribes what makes incriminatory statements admissible in evidence, and thus what statements are excluded, but the statute says nothing about the exclusion of evidence *derived* from such inadmissible statements.  In this respect, OCGA § 24-8-824 is similar to most other rules of evidence, including the other hearsay rules.  We are aware of no support for the proposition that the General Assembly, simply by enacting a rule excluding evidence from trial, means also to exclude all evidence derived from the primary inadmissible

27

evidence.[7]

To the contrary, where the General Assembly wants courts to invoke the "fruits" doctrine, it knows how to express that intention in the text of the statute. See OCGA § 24-5-507 (a) (stating that when a witness is given statutory immunity, "no testimony or other evidence required under the order [granting immunity] *or any information directly or indirectly derived from such testimony or evidence* shall be used against the person in any proceeding or prosecution for a crime or offense concerning which he or she testified or produced evidence under court order. . . ." (emphasis added)). See also OCGA § 16-17-5 (d) ("In a criminal proceeding under this chapter [relating to illegal payday loans], a person's return of proceeds under this Code section *and any evidence derived as a result of such return* shall not be admissible." (emphasis added)).

Moreover, OCGA § 24-1-2 (c) (5) expressly provides that, except for the rules on privileges (which include OCGA § 24-5-507), the rules of evidence "shall not apply in . . . [p]roceedings for the issuance of warrants for arrest and

---

[7] We note in this respect that the Civil Practice Act expressly provides for discovery of information that would itself be inadmissible at trial (such as hearsay), so long as it "appears reasonably calculated to lead to the discovery of admissible evidence." OCGA § 9-11-26 (b) (1). This provision would be nonsensical if obtaining the inadmissible evidence tainted and made inadmissible the otherwise admissible evidence to which it led.

28

search warrants." This was also the law regarding the application of hearsay rules in warrant proceedings under the old Evidence Code. See Lewis v. State, 255 Ga. 101, 105 (335 SE2d 560) (1985). It would make no sense to allow incriminatory statements that are involuntary under OCGA § 24-8-824 to be used to secure search and arrest warrants (as happened in this case), but then to forbid the use at trial of any evidence acquired as a result of the warrants because it was the fruit of the incriminatory statements.

As for whether suppression of the fruits of an OCGA § 24-8-824 violation is mandated by constitutional considerations, we recognize that our decisions have sometimes conflated the analysis of whether a confession is voluntary under the statutory standard with the analysis of whether the confession is voluntary under the constitutional due process standard. This imprecision may stem from the fact that proof that a defendant's incriminatory statement was induced by a hope of benefit or fear of injury in violation of OCGA § 24-8-824 is generally significant proof that his constitutional rights were also violated. See, e.g., United States v. Lall, 607 F3d 1277, 1286 (11th Cir. 2010) ("'[G]iven the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most

29

significant factor in assessing the [constitutional] voluntariness of an accused's confession in light of the totality of the circumstances.'" (citation omitted)).

But a violation of OCGA § 24-8-824 is not *automatically* a federal constitutional violation too, because the tests for determining the voluntariness of a confession under the statute and under the Constitution are not the same. The statutory text focuses the court on a single question — whether the defendant's statement was induced by "the slightest hope of benefit or remotest fear of injury." See, e.g., Foster, 283 Ga. at 487-488. By contrast, in evaluating whether the defendant's statement was voluntary as a matter of constitutional due process, courts have rejected such a narrowly focused test and consider instead the totality of the circumstances. See Lall, 607 F3d at 1285 ("[The] suggestion of a per se rule that would render a confession involuntary [under the Due Process Clause] if it was preceded by 'any direct or implied promises, however slight,' has been rejected by the [U. S.] Supreme Court. Instead, the issue of voluntariness must be determined by examining the totality of the circumstances." (citing Arizona v. Fulminante, 499 U. S. 279, 284-285 (111 SCt 1246, 113 LE2d 302) (1991)). A review of the origins and development of what is now OCGA § 24-8-824 demonstrates that it is a statute based on a common-

30

law rule of evidence that focuses solely on the reliability — the truth or falsity — of confessions, rather than a statute meant to implement constitutional protections against involuntary confessions, which in the past century have come to reflect concerns about fairness, due process, and self-incrimination as well as reliability, see generally Edward J. Imwinkelried et al., Courtroom Criminal Evidence § 2304 (5th ed. 2014).

Under English common law at the time of Georgia's independence in 1776, confessions that were made "under threats and promises" were inadmissible as evidence at trial. See George E. Dix, Mistake, Ignorance, Expectation of Benefit and the Modern Law of Confessions, 1975 Wash. U. L. Q. 275, 280, n. 7 (1975) ("'The instance has frequently happened, of persons having made confessions under threat or promises: the consequence as frequently has been, that such examinations and confessions have not been made use of against them on their trial.'" (quoting The King v. Rudd, 168 Eng. Rep. 160, 161 (K.B. 1775))). This exclusion was based not on notions of fairness but on the perceived unreliability of such statements. See id. at 280. In The King v. Warickshall, 168 Eng. Rep. 234 (K.B. 1783), for example, the court explained that "a confession forced from the mind by the flattery of hope, or by the torture

31

of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it." Id. at 235.

The common law of England as of May 14, 1776, has long been the backstop law of Georgia, see OCGA § 1-1-10 (c) (1), and once this Court was established, it followed the English rule, showing the same concern for excluding unreliable evidence. See Stephen v. State, 11 Ga. 225, 234 (1852). When the law of Georgia was codified, this evidentiary rule was put into statutory form using essentially the same words that now appear in OCGA § 24-8-824. See Ga. Code of 1863, § 3716 ("To make a confession admissible, it must have been made voluntarily without being induced by another, by the slightest hope of benefit or remotest fear of injury."). As our Court of Appeals explained a century ago:

> This regard for the weakness of humanity and the strong probability that one accused of crime may be induced to say that which is not true, through hope of benefit or fear of punishment, accounts for the existence of the strict rule stated in [the Code] . . . . This statute, however, is not a fresh particle dropped into the theretofore existing body of the law, but it is to be regarded as a rule deducible from the common law, and from many decisions of the courts since the beginning of our jurisprudence.

Wilson v. State, 19 Ga. App. 759, 766-767 (92 SE 309) (1917). None of the

32

early cases applying this rule discuss it in relation to constitutional doctrine.

The common law also held that the fruits of a confession improperly induced by hope or fear — the location of the victim's body or of stolen goods, for example — were *not* to be excluded, because such fruits were not themselves untrustworthy and in fact demonstrated the *truthfulness* of the defendant's statement leading the authorities to the evidence. Thus, in <u>Warickshall</u>, the English court explained:

> Th[e] principle respecting confessions has no application whatever as to the admission or rejection of facts, whether the knowledge of them be obtained in consequence of an extorted confession, or whether it arises from any other source; for a fact, if it exist at all, must exist invariably in the same manner, whether the confession from which it is derived be in other respects true or false. . . . It is true, that many able judges have conceived that it would be an exceeding hard case, that a man whose life is at stake, having been lulled into a notion of security by promises of favor, and in consequence of those promises has been induced to make a confession by the means of which the [stolen] property is found, should afterwards find that the confession with regard to the property found is to operate against him. But this subject has more than once undergone the solemn consideration of the twelve judges; and a majority of them were clear of opinion, [t]hat although confessions improperly obtained cannot be received in evidence, yet that any acts done afterwards might be given in evidence, notwithstanding they were done in consequence of such confession.

168 Eng. Rep. at 235.

33

The Warickshall court added that if evidence found because of an involuntary confession was admitted at trial, it "must be fully and satisfactorily proved, without calling in the aid of any part of the confession from which they may have been derived." Id. However, this point — whether the court could admit at trial only the fruits of an involuntary confession or also the portion of the confession that led to them and thus was shown to be reliable — was not settled in the common law. See State v. Douglass, 20 W.Va. 770, 784-785 (1882) (discussing this disagreement, contrasting Hodge's Case, 2 East P.C. 658 (1790), in which the court admitted testimony that the defendant described the place where the stolen goods were found, with Harvey's Case, 2 East P.C. 658 (1800), in which the court did not admit any evidence of the confession's contents).

Georgia adopted the common-law evidence rule allowing the admission of fruits derived from an involuntary confession, as well as the rule that the part of the confession that led to those fruits could be admitted because the finding of the fruits proved that part of the confession reliable. Thus, alongside the original statute codifying the evidentiary rule that confessions induced by the hope of benefit or fear of injury should be excluded, the legislature codified the

34

rule that the fruits of such a confession, and the related portion of the confession, were properly admissible as evidence. See Ga. Code of 1863, § 3718 ("Any material facts discovered by a confession by a prisoner may be proved, and the fact of its discovery, by reason of such information, though the confession is rejected."). This Court explained the rationale for this approach in Daniels v. State, 78 Ga. 98, 104-105 (1886):

> The reason for rejecting confessions improperly obtained is, their liability to prove false by reason of the motive which induce them, but when they are corroborated and confirmed by the discovery to which they lead, the reason for their rejection ceases, and ratione cessante ipsa lex cessat [the law itself ceases if the reason of the law ceases].

Id. at 104-105.

A version of § 3718 remained in the Georgia Code alongside the predecessors of OCGA § 24-8-824 until 1981, when it was repealed with no explanation and no indication that the repeal was due to constitutional considerations. See Ga. L. 1981, p. 875. In the absence of law to the contrary, this repeal returned Georgia to the common-law rule. See Gray v. Obear, 54 Ga. 231, 234 (1875) (explaining that the repeal of a statutory provision, "without more, [leaves] the common law applicable to that question in full force and

35

operation"); <u>Warren v. State</u>, 255 Ga. 151, 156, n. 11 (336 SE2d 221) (1985) (explaining that "'[t]he Common Law of England, and such of the Statute Laws as were usually in force before the revolution'" will be enforced by Georgia courts to the extent they are not inconsistent with the statutory and constitutional laws of Georgia and the United States (citation omitted)); OCGA § 1-1-10 (c) (1). As explained previously, the settled common-law rule allowed the fruits of a confession induced by a hope of benefit or fear of injury to be admitted into evidence, and this understanding of current Georgia law is fully consistent with the text on this subject that remains in the Code as OCGA § 24-8-824, which provides for the inadmissibility only of such involuntary confessions, saying nothing about the exclusion of their fruits. The repeal of § 3718 was not without import, however. It eliminated the statutory basis for the admission into evidence of the portion of an involuntary confession that led to the admissible fruits. This admission of part of the involuntary confession was not a settled rule of the common law and, if still allowed, it would conflict with the text of OCGA § 24-8-824, which mandates the inadmissibility of an involuntary confession without exception.

While the constitutional jurisprudence on confessions also has its roots in

the reliability concerns developed in the English common law of evidence, which became the Georgia evidence law now codified in OCGA § 24-8-824, the constitutional analysis has evolved to encompass broader concerns, as the U. S. Supreme Court made explicit in discussing the admissibility of confessions in Lisenba v. California, 314 U. S. 219, 236 (62 SCt 280, 86 LE 166) (1941):

> The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false. The criteria for decision of that question may differ from those appertaining to the State's rule as to the admissibility of a confession.

Id. at 236. See also Dickerson v. United States, 530 U. S. 428, 433 (120 SCt 2326, 147 LE2d 405) (2000) (tracing the history of the admissibility of confessions).

We have found no case holding that the fruits of a confession that is inadmissible under OCGA § 24-8-824 (or its predecessors) must be excluded from evidence. There are two opinions in which our reasoning suggested that we might so hold where a confession was statutorily involuntary. See Pitchford v. State, 294 Ga. 230, 235-236 (751 SE2d 785) (2013) (contrasting the suppression of the fruits of a statement "made involuntarily" with the exception to the fruits doctrine recognized for violations of the prophylactic constitutional

37

rules set forth in Miranda and Edwards v. Arizona, 451 U.S. 477 (101 SCt 1880, 68 LE2d 378) (1981), and then explaining that the statement at issue was voluntary under the predecessor to OCGA § 24-8-824); Taylor v. State, 274 Ga. 269, 273, 276 (553 SE2d 598) (2001) (saying that the defendant's statement was voluntary because it was not elicited by a "hope of benefit," and "because the gun was [thus] the fruit of a voluntary statement, . . . it is admissible at [the defendant's] trial"). These two opinions, however, did not analyze the text or history of the statute, or even acknowledge that constitutional voluntariness and statutory voluntariness are different doctrines with different consequences. Based on the analysis of these issues in this opinion, Pitchford and Taylor are hereby disapproved to the extent that they can be read as indicating that the fruits of statements obtained in violation of OCGA § 24-8-824 must be suppressed.

Because the fruit of the poisonous tree doctrine does not, as a matter of law, apply to violations of OCGA § 24-8-824, the trial court reached the right result in ruling that Chulpayev's April 2013 statements should not be suppressed on statutory grounds, as those statements were not themselves obtained in violation of the statute and, although they are in fact the fruits of his previous

38

statements obtained in violation of OCGA § 24-8-824, they are not suppressible for that reason.

(c) This does not necessarily mean that the trial court reached the right result with respect to the motion to suppress the April 2013 statements, because Chulpayev also claimed that his July and October 2012 statements were obtained in violation of his constitutional rights, and the broad exclusionary rule, including the fruits doctrine, does apply to constitutionally involuntary confessions. See Lall, 607 F3d at 1291. See also Michigan v. Tucker, 417 U. S. 433, 446-447 (94 SCt 2357, 41 LE2d 182) (1974). As explained above, the statutory and constitutional voluntariness standards differ, and while proof that a confession was induced by a hope of benefit in violation of the statute is significant proof that due process was also infringed, the court must consider that factor among the totality of the circumstances. The trial court did not distinctly rule on Chulpayev's constitutional claim, and so we have nothing to review on that point. See Marks v. State, 280 Ga. 70, 74 (623 SE2d 504) (2005) ("This Court . . . 'will not rule on a constitutional question unless it clearly appears in the record that the trial court distinctly ruled on the point.'" (citation omitted)). We therefore vacate the trial court's judgment with respect to

Chulpayev's April 2013 statements and remand with direction for the court to decide whether  any of his statements were obtained in violation of his constitutional rights and whether, as a result, the April 2013 statements must be suppressed.

Judgment affirmed in Case No. S14A1375. Judgment vacated and case remanded in Case No. S14X1376.  All the Justices concur.

Decided March 27, 2015.

Murder. Fulton Superior Court. Before Judge Schwall.

Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Lenny I. Krick, Joshua D. Morrison, Assistant District Attorneys, for appellant.

Tanya F. Miller, Renee R. Rockwell, for appellee.