**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and PETERSON, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 28, 2016**

# In the Court of Appeals of Georgia

A16A1704. THE STATE v. HALL.

BARNES, Presiding Judge.

A Clayton County police officer, Ryan Coker Hall, was indicted for simple battery based on his use of force during an encounter with a homeowner whom he believed might be a burglar. Hall filed a motion seeking immunity from prosecution under OCGA § 16-3-24.2, arguing that his use of force was reasonable and justified in light of the homeowner's resistance to being handcuffed and detained. Following an evidentiary hearing that included witness testimony and cell phone video footage of most of the incident, the trial court granted Hall's motion for immunity, resulting in this appeal by the State. For the reasons discussed below, we affirm.

On appeal from the trial court's grant or denial of immunity under OCGA § 16-3-24.2, we view the evidence in the light most favorable to the trial court's ruling. *Sifuentes v. State*, 293 Ga. 441, 444 (2) (746 SE2d 127) (2013). So viewed, the evidence presented at the immunity hearing showed that around noon on May 2,

2014, a concerned neighbor called 911 and reported a burglary in progress at a residential address in Jonesboro. The neighbor told the 911 dispatcher that a red Durango sport utility vehicle ("SUV") was parked in the rear of a newly renovated house in the neighborhood and that a man was going in and out of the house. The neighbor described the man as "breaking into" the house and provided the dispatcher with the residential street address.

During the time period in question, Hall was an officer with the Clayton County Police Department assigned to a special crime suppression unit that responded to residential burglaries and other high priority calls. Hall and his partner responded to the 911 call of the burglary in progress.

Hall and his partner parked down the street from the house where the suspected burglary was taking place and were joined by another patrol officer and a police captain.[1] The four officers then proceeded towards the house on foot with their guns drawn. When the officers arrived at the house, they did not see any visible signs of forced entry, such as broken windows or doors, but a red Durango SUV was parked in the back of the house, consistent with the description provided by the 911 caller.

---

[1] For ease of reference, the four officers who first responded to the scene will be referred to collectively as the "officers" and separately as Hall, Hall's partner, the patrol officer, and the police captain.

2

Hall's partner went to the back of the house, and Hall, the patrol officer, and the police captain approached the front of the house from different directions. The patrol officer stepped up onto the front porch, where he saw a 70-year-old man later identified as Almyahid Bin-Wahad at an upstairs window and gestured for him to come to the front door. Once Bin-Wahad came to the door, the patrol officer asked him to identify himself. However, Bin-Wahad would not provide his name and demanded to know why the officers were at his house. When asked if anyone else was inside the house, Bin-Wahad initially did not respond but then said that no one else was there. According to the patrol officer, Bin-Wahad was angry, waived his hands around as he spoke, and kept interrupting the patrol officer as he tried to explain that they were at the house to investigate a suspected burglary.

Unsure whether Bin-Wahad was in fact the homeowner or a possible intruder in light of the 911 call, the patrol officer asked Bin-Wahad to calm down and instructed him to come outside onto the front porch for further investigation. Bin-Wahad initially questioned why he needed to come outside but then stepped out onto the porch. The patrol officer and Hall, who had holstered their firearms, stood near Bin-Wahad on the porch while the police captain stood a short distance away and observed the interaction.

3

According to the officers, Bin-Wahad angrily told them that he was moving into the house that day, was belligerent and argumentative in response to their investigatory questions, would not keep his hands down, and kept yelling at the officers about their presence at the home despite their requests that he calm down. Bin-Wahad was yelling so loudly at the officers that Hall's partner could hear him from the back of the house.

While on the porch, the officers requested to see Bin-Wahad's identification, but Bin-Wahad said that his driver's license was in the SUV parked in the back of the house. The officers then offered to have another officer get the driver's license out of the SUV, but Bin-Wahad said the car doors were locked and the keys were inside the house. According to the patrol officer, "it was a little merry-go-round that we were on, where we were getting nowhere" in ascertaining Bin-Wahad's identity.

As the officers spoke with Bin-Wahad and attempted to calm him down, Hall took hold of Bin-Wahad's arm to keep him from moving around on the porch, conducted a pat-down search for weapons, and found none. According to the officers, Bin-Wahad remained belligerent and argumentative as they continued to question him, and Bin-Wahad became upset that Hall was holding onto his arm. Hall then repeatedly instructed Bin-Wahad to sit on the porch for safety reasons, but Bin-

4

Wahad refused to cooperate until the police captain came up to the front porch and convinced him to sit down. Hall released Bin-Wahad's arm once he sat down, and Bin-Wahad again said that no one else was in the house.

As Hall was speaking with the seated Bin-Wahad, the patrol officer went inside the house to secure it. Because he was focused on Bin-Wahad, Hall did not see the patrol officer enter the house, and the patrol officer did not communicate on the police radio that he was entering the house. Shortly thereafter, Hall received a radio transmission from his partner, who remained positioned at the back of the house, that he had just seen another male peeking out of a back window of the house.

Believing that another suspect was in the house and that Bin-Wahad had deceived the officers by claiming that no one else was there, Hall decided to place Bin-Wahad in handcuffs to more securely detain him on the porch while the inside of the house was secured. Hall testified that at that point, he did not know "if somebody was going to come running outside the house . . . and now I'm dealing with two people on the front porch."

Hall testified that after deciding to handcuff Bin-Wahad, he told Bin-Wahad that he was being detained and to put his hands behind his back. However, according to Hall, as he took Bin-Wahad's left wrist to handcuff it, Bin-Wahad pulled his left

5

arm away from Hall, turned his body, and began to stand. In response to Bin-Wahad's actions, Hall testified that he attempted to use an arm bar technique as a defensive tactic to bring Bin-Wahad down on the porch so that he could be handcuffed. Hall further testified that Bin-Wahad's position on the steps and Bin-Wahad's movement made it difficult for him to apply the arm bar technique, and Bin-Wahad fell to the ground and struck his head and shoulder on the front wall of the house as Hall attempted to use the technique on him. Hall and the police captain then handcuffed Bin-Wahad and detained him on the front porch while other officers secured the house.

After Bin-Wahad was handcuffed and detained on the porch, the house was secured by other officers and no other suspects were found. The officers then realized that Hall's partner had mistaken the patrol officer who initially entered the house for another suspect.[2] Bin-Wahad's driver's license was obtained from his truck and the officers were able to determine that he lived at the house. Once that determination was made, Hall removed the handcuffs and released Bin-Wahad, who had no visible injuries.

---

[2] The patrol officer was later disciplined for violating protocol by entering the house to secure it without assistance and by not announcing the same on the radio.

Unbeknownst to the officers, a witness who was visiting a friend at another house in the neighborhood recorded most of the police encounter on his cell phone through a front window of the house, which was approximately 200 feet away from where the encounter occurred. The cell phone recording did not include any audio footage of the police encounter.

A grand jury subsequently indicted Hall on one count of simple battery for grabbing [Bin-Wahad's] arm and taking him to the ground in a manner that caused injury to his neck and shoulder area." Hall filed a motion to be granted immunity from prosecution under OCGA § 16-3-24.2 on the grounds that his actions were reasonable and justified in light of Bin-Wahad's resistence to being handcuffed. The trial court thereafter conducted an evidentiary hearing on Hall's immunity motion.

At the immunity hearing, the defense theory of the case was that Hall applied an arm bar technique to take Bin-Wahad to the ground as a defensive measure when Bin-Wahad resisted being handcuffed after the erroneous radio transmission about another suspect in the house, and that Hall's use of force was reasonable and justified under the circumstances to protect himself. In contrast, the State's theory of the case was that Bin-Wahad never resisted and that Hall instead grabbed him by the arm, lifted him up from the porch, threw him to the ground, and handcuffed him in an

7

unreasonable and unprovoked use of force after hearing the erroneous radio transmission.

In support of the defense theory of the case, Hall testified, as summarized above, that he applied the arm-bar technique as a defensive measure when Bin-Wahad resisted being handcuffed by pulling his left arm away from Hall, turning, and attempting to stand up on the porch after there had been a radio transmission that a second suspect was in the house. Likewise, as previously summarized, the other three responding officers testified that Bin-Wahad had been argumentative and belligerent throughout their encounter with him and had been uncooperative when given commands by the officers.

In addition to the testimony of Hall and the other responding officers, Hall presented the testimony of several experts in support of the defense theory of the case. An expert in the areas of police training, use of force, and police defensive tactics testified that officers are trained that a burglary in progress is a dangerous, high priority call. According to the expert, burglaries often are committed by more than one suspect, the suspects frequently are armed, and suspects caught in the act often will fight or flee or may try to "bully" their way out of being arrested. The expert also went through the cell phone video and made observations about the interaction

between Hall and Bin-Wahad and about how Hall's actions, including use of the arm bar technique, conformed to Clayton County Police Department's use of force policy, in his professional opinion.

Hall presented the testimony of another expert in police training on the use of force and legal procedures. The expert testified that he had created still photographs from the cell phone video, and the photographs were introduced into evidence at the hearing. The expert gave a detailed explanation of the actions of Hall and Bin-Wahad that could be seen in each still photograph, and he testified that Hall's particular stance while attempting to handcuff the seated Bin-Wahad was inconsistent with the State's theory that Hall had pulled Bin-Wahad up from a seated position. Rather, the expert opined, the still photographs showed that Bin-Wahad had turned and tried to stand up when Hall attempted to handcuff him and that Hall then had attempted to apply the arm bar technique. The expert further opined that based on Bin-Wahad's resistance to being handcuffed by attempting to turn and stand, Hall's defensive actions were consistent with the use of force standards upon which Clayton County officers are trained.

The State relied upon the testimony of Bin-Wahad to support its theory of the case. In contrast to the testimony of Hall, Bin-Wahad testified that, without warning, Hall pulled him up from a seated position on the porch, threw him to the ground, and handcuffed him after receiving the radio transmission that someone else was in the house. Bin-Wahad denied that he attempted to pull away from Hall, turn, or stand up when being handcuffed, and he testified that, contrary to the testimony of the officers, he had not been belligerent towards them and had answered all of the questions that they posed to him. The State did not present any expert witnesses in support of its theory of the case.

In addition to witness testimony, a recording and transcript of the 911 call, a recording and transcript of the radio transmissions between the officers at the scene, and the cell phone recording of the police encounter were introduced into evidence at the hearing. Both sides claimed that the cell phone video corroborated their version of events.

After hearing the conflicting testimony and reviewing the cell phone video and other exhibits, the trial court entered its order granting Hall's motion for immunity. In granting Hall's motion, the trial court expressly declined to credit the testimony of Bin-Wahad regarding the handcuffing incident. The trial court instead found that Hall

had proven by a preponderance of the evidence that his actions were reasonable and justified because he had reason to believe that Bin-Wahad might be involved in a burglary in process and that another suspect might be in the residence, Bin-Wahad was aggressive and belligerent to the officers, and Bin-Wahad had physically resisted being detained as Hall tried to handcuff him. Based on these findings, the trial court ruled that Hall was immune from prosecution for simple battery pursuant to OCGA § 16-3-24.2. This appeal by the State followed.

"A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force[.]" OCGA § 16-3-21 (a). If the person's use of force is so justified, then OCGA § 16-3-24.2 provides that the person "shall be immune from criminal prosecution."

Whether a person is immune from criminal prosecution under OCGA § 16-3-24.2 must be determined by the trial court before trial. *Fair v. State*, 284 Ga. 165, 165-166 (1) (664 SE2d 227) (2008). The defendant carries the burden of showing that he is entitled to pre-trial immunity by a preponderance of the evidence. *Bunn v. State*, 284 Ga. 410, 413 (3) (667 SE2d 605) (2008). On appeal from the trial court's grant

11

or denial of pre-trial immunity, "we must view the evidence in the light most favorable to the trial court's ruling and accept the trial court's findings of fact and credibility determinations if there is any evidence to support them." *Sifuentes*, 293 Ga. at 444 (2).

The State argues on appeal that the trial court erred by granting Hall's immunity motion because Hall failed to prove by a preponderance of the evidence that his use of force in handcuffing and detaining Bin-Wahad was justified.[3] We disagree.

The right of law enforcement officers to conduct an investigatory detention of a suspect "necessarily carries with it the right to use some degree of physical coercion

---

[3] The State does not contest that Hall was conducting an investigatory detention rather than a de facto arrest of Bin-Wahad when he handcuffed and restrained Bin-Wahad on the front porch. See generally *Smith v. State*, 281 Ga. 185, 187 (2) (640 SE2d 1) (2006) ("This Court has recognized that officers may handcuff a suspect during an investigatory stop when such action is either reasonable under the circumstances to protect themselves or the public, or to maintain the status quo."); *Gray v. State*, 296 Ga. App. 878, 880 (1) (676 SE2d 36) (2009) (handcuffing of suspect did not transform investigatory detention into de facto arrest). Nor does the State contest that Hall had a reasonable and articulable suspicion to conduct an investigatory detention of Bin-Wahad. See generally *Smith v. State*, 165 Ga. App. 333, 334 (1) (299 SE2d 891) (1983) ("A police officer is authorized to make a brief, investigatory detention of an individual for the purpose of maintaining the status quo and obtaining information, provided he can point to specific and articulable facts which, together with rational inferences drawn therefrom, reasonably warrant such an intrusion.").

12

or threat thereof to effect it, . . . [but] an officer may not use more force than is reasonably necessary under the circumstances." (Punctuation and footnotes omitted.) *Campbell v. Goode*, 304 Ga. App. 47, 49-50 (2) (695 SE2d 44) (2010). See *Mullis v. State*, 196 Ga. 569, 577-578 (4) (27 SE2d 91) (1943) (police officer "can use no more force than is reasonably necessary under the circumstances, and cannot use unnecessary violence disproportionate to the resistance offered"). See also *Graham v. Connor*, 490 U.S. 386, 396 (109 SCt 1865, 104 LE2d 443) (1989); *Long v. State*, 261 Ga. App. 478, 479 (1) (583 SE2d 158) (2003). A suspect has no right to resist the use of reasonable force by an officer effectuating a lawful investigatory detention, see *Bynes v. State*, 336 Ga. App. 223, 228 (3) (a) (784 SE2d 71) (2016), and, conversely, an officer is entitled to protect himself from attack or resistance by a hostile suspect and "may lawfully detain the . . . [suspect] in a manner reasonably necessary to protect his personal safety and to maintain the status quo." (Citation and punctuation omitted.) *Gray*, 296 Ga. App. at 879-880 (1).

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense,

13

uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation.

(Citations and punctuation omitted.) *Graham*, 490 U.S. at 396-397.

Mindful of this precedent, and in light of the testimony of Hall, the other three responding officers, and Hall's experts in the use of force, we conclude that there was some evidence to support the trial court's finding that Bin-Wahad was physically resisting being handcuffed and detained by Hall, and that Hall's application of the arm bar technique as a defensive measure to bring Bin-Wahad to the ground and handcuff him was a use of force that was reasonable and proportionate to the resistance offered. "Construed in a light most favorable to the trial court's ruling, . . . the evidence was sufficient for the trial court to determine that [Hall] met his burden of proving that he was entitled to immunity from prosecution pursuant to OCGA § 16-3-24.2." (Citation and punctuation omitted.) *State v. Jennings*, 337 Ga. App. 164, 167 (786 SE2d 545) (2016). See *Bunn*, 288 Ga. at 23.

The State argues that the cell phone video contradicts Hall's version of events and shows that Bin-Wahad did not resist being handcuffed and detained, and that the trial court therefore erred in finding that Hall proved justification by a preponderance of the evidence. It is true that "[t]his Court owes no deference to a trial court's factual

findings gleaned from a review of a videotape that are not the subject of testimony requiring the trial court's weighing of credibility or resolving of conflicts in the evidence." *Clay v. State*, 290 Ga. 822, 825 (1) (A) (2), n.1 (725 SE2d 260) (2012). See *Hughes v. State*, 296 Ga. 744, 746 (1), n.5 (770 SE2d 636) (2015). But where the trial court's resolution of the factual issues turns in part on an assessment of conflicting witness testimony, rather than exclusively on what is shown in a videotape, we defer to the trial court's factual findings under the "any evidence" standard of review. See *State v. Chulpayev*, 296 Ga. 764, 771 (2), n. 5 (770 SE2d 808) (2015)*; Clay*, 290 Ga. at 825 (1) (A) (2), n.1; *McKinney v. State*, 326 Ga. App. 753, 755 (1), n. 5 (755 SE2d 315) (2014)*; State v. Floyd*, 306 Ga. App. 402, 402, n. 1 (702 SE2d 467) (2010); *State v. Mohammed*, 304 Ga. App. 230, 231-232 (695 SE2d 721) (2010).

Here, there was no audio included in the cell phone video, and thus the video did not resolve the conflict in the testimony regarding whether Bin-Wahad was argumentative and belligerent towards the officers, and regarding whether Hall told Bin-Wahad that he was being detained and to put his arms behind his back before attempting to handcuff him. Furthermore, resolution of the central factual dispute in this case – whether Bin-Wahad pulled his left arm away from Hall, turned, and

attempted to stand when Hall sought to handcuff him, or whether Hall without warning pulled Bin-Wahad up from a seated position on the porch and threw him to the ground – was based in part on the conflicting testimony of the witnesses rather than exclusively on a review of the cell phone video.

Because resolution of the immunity issues in this case turned in part on witness testimony, we defer to the trial court's factual findings. We therefore affirm the court's ruling that Hall established by a preponderance of the evidence that his use of force was reasonable and justified under the circumstances, entitling him to immunity from prosecution. See *Bunn*, 288 Ga. at 23; *Jennings*, 337 Ga. App. at 167; *Mohammed*, 304 Ga. App. at 231-232.

*Judgment affirmed. Boggs and Peterson, JJ., concur fully and specially.*

A16A1704. STATE v. HALL

PETERSON, Judge, concurring fully and specially.

I concur in the majority opinion and all that I understand it to say. I write separately to make clear my understanding of what that opinion says. As the majority opinion explains, the critical factual dispute was "whether Bin-Wahad pulled his left arm away from Hall, turned, and attempted to stand when Hall sought to handcuff him" (and thereby provided Hall with reasonable grounds to believe him an imminent threat), "or whether Hall without warning pulled Bin-Wahad up from a seated position on the porch and threw him to the ground." The video is not clear enough for us to determine with confidence from the video which disputed set of facts are true. If it was, we would owe no deference to the trial court's factual findings on this question, regardless of whether they were based in part on resolving conflicting witness testimony. But we do owe deference here because the video alone does not resolve the factual dispute and the trial court had to resolve conflicting witness testimony to decide the matter.

I am authorized to state that Judge Boggs joins in this special concurrence.